### WOMEN STRIKE FOR PEACE

v.

### Rogers C. B. MORTON, Secretary of the Interior, et al., Appellants.

### No. 24913.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1971.

Decided July 14, 1972.

Judgment Dec 10, 1971.

Opinions and new judgment vacating judgment of Dec. 10, 1971 filed July 14, 1972.

---

Mr. Gil Zimmerman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the briefs were filed, and John A. Terry and Joseph M. Hannon, Asst. U. S. Attys., were on the brief, for appellants.

Mr. Stuart A. Smith, Washington, D. C., with whom Mrs. Margery Waxman Smith and Messrs. Elliott C. Lichtman and Ralph J. Temple, Washington, D. C., were on the brief, for appellee.

Before WRIGHT, LEVENTHAL and ROBB, Circuit Judges.

PER CURIAM:

Appellee is an anti-war organization which for some time has been seeking permission from the appellants to erect a temporary display in a national area near the White House called the Ellipse. After several unsuccessful attempts to obtain permission, appellee filed this action in the District Court for injunctive and declaratory relief. After initially granting the Government's motion for summary judgment and being reversed by this court, Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969), the District Court eventually granted the relief requested. We affirm.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge:

This case presents the latest chapter in the long and acrimonious dispute between various peace organizations and the Department of the Interior over the proper use of public park land in the District of Columbia.[1] More broadly, it poses once again the age-old question whether the Government may, in the guise of regulation, institute a system of standardless prior restraint which silences all voices except those meeting official approval.

For over three years, Women Strike for Peace (hereinafter WSP) has been seeking permission to erect a small, temporary display in a national park area known as the Ellipse.[2] The structure, eight feet high, 20 feet long and six feet deep, consists of 11 styrofoam tombstones, and is intended to commemorate those who have died in Southeast Asia.[3] When the Government rejected WSP's

---

1. *See* A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971); A Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 429 F.2d 185 (1970); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F. 2d 597 (1969); A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); Jeannette Rankin Brigade v. Chief of the Capitol Police, 137 U.S.App.D.C. 155, 421 F.2d 1090 (1969); Jeannette Rankin Brigade v. Chief of Capitol Police, D.D.C., 342 F. Supp. 575 (1972). *Cf.* Allen v. Hickel, 138 U.S.App.D.C. 31, 424 F.2d 944 (1970).

2. The Ellipse is a large rectangular park in the general vicinity of the White House. Its length runs along Constitution Avenue between 15th and 17th Streets, N.W., and its width extends three city blocks from Constitution Avenue to E Street. *See* Findings of Fact entered at the close of the limited remand hearing, Joint Appendix (hereinafter JA) at 58.

3. *See* Women Strike for Peace v. Hickel, D.D.C., Civil Action No. 1455–69, Dec. 14, 1970 (unreported), JA at 26.

application for a permit to erect the display, WSP filed this suit seeking declaratory and injunctive relief. It argues that it has a First Amendment right to use the Ellipse so long as it does not substantially interfere with other park activities. Moreover, it maintains that the Government may not refuse it permission to use the Ellipse while simultaneously granting such permission to other private groups wishing to use it for similar purposes. In response, the Government argues that WSP's display is forbidden by the applicable regulations governing use of national park land,[4] that these regulations constitute a proper exercise of the Government's plenary powers over public land,[5] and that the regulations have been fairly and consistently applied.

The parties thus join issue on the extent to which the Government is obligated to turn over use of public park land to private groups seeking to engage in First Amendment conduct. It should be noted at the outset that this is hardly an issue of first impression. Years ago in Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), Mr. Justice Roberts declared:

" * * * Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. * * * "[6]

Since *Hague*, the Supreme Court has repeatedly reaffirmed the First Amendment right of access to public places for expression of views—subject, of course, to reasonable regulations narrowly drawn to protect other competing interests.[7]

But while most of us consider this right to be a part of our basic constitutional jurisprudence, it is apparently still open to question at the Department of the Interior. Thus the Department initially contended that it could deny WSP's request without stating any reason at all for the denial beyond the conclusory assertion that the proposed demonstration was "not an appropriate use of Federally-owned park lands and * * * not consistent with the protection and use of the Ellipse area."[8] Two and a half years of litigation have coaxed a variety of other, seemingly more substantial, excuses from the Department for why WSP's request cannot be granted. But although these reasons are baffling in their complexity and prolixity,[9] they do not amount to the sort of substantial governmental interest which the Supreme Court has found to be necessary if speech-related conduct is to be curbed.[10] Instead of pointing to any such discrete interest, the Government

4. The regulations, revised in response to this court's first remand in this case, can be found in 36 C.F.R. § 50.19 (1972).

5. *See, e. g.,* Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Com'n, 393 U.S. 186, 191–194, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968).

6. 307 U.S. at 515, 59 S.Ct. at 964.

7. *See, e. g.,* Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Gregory v. Chicago, 394 U.S. 111, 89 S. Ct. 946, 22 L.Ed.2d 134 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

8. *See* letter from William R. Failor, Superintendent of National Parks-Central, to WSP, Dec. 18, 1968, JA at 101.

9. The Government states three independent reasons for its action which are, in turn, subdivided into no fewer than 10 subreasons and which require three full pages in its brief merely to state. *See* brief for appellants at vii–x.

10. *See* United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

ultimately chooses to rest upon the sweeping assertion that "[its] constitutional power * * * to limit uses of its public property consistently with its reasonable views as to what the public interest and the 'general comfort and convenience' paramountly require, is not to be doubted." [11] If the Government means by this assertion that such power is not doubted by the lawyers in the Department of the Interior, then it is merely restating a proposition made all too obvious by the Department's unfortunate record in this litigation. But if, as seems more likely, the Government means that courts must accept curtailment of First Amendment activity in accordance with a standard no more precise than the "public interest," then its position raises the most serious sort of constitutional doubt. [12]

For reasons detailed below, in my judgment the Government lacks power to pick and choose among citizens wishing to communicate their views on the basis of what some administrator thinks is in the "public interest." Moreover, the Government has failed to come forward with the kind of substantial and specific countervailing interest which would justify curtailment of WSP's speech-related conduct. WSP therefore has a constitutional right to erect its display in the Ellipse area.

## I

This dispute began on November 4, 1968, when WSP filed an application for a permit to erect its display as an adjunct to the Christmas Pageant for Peace, held annually on the Ellipse during the Christmas season. [13] The Christmas Pageant, a so-called "National Celebration Event," has occupied a portion of the Ellipse during each Christmas season since 1954. [14] The Pageant is produced by a private civic organization known as Christmas Pageant for Peace, Inc., with the co-sponsorship of the National Park Service. [15] It consists of a large Christmas tree at the center of the Ellipse and a group of satellite displays which together occupy only a small portion of the park. [16] WSP requested that it be allowed to erect its display on "[a]n area of the Ellipse adjacent to that occupied by the Pageant of Peace but sufficiently removed so as to avoid any interference with already scheduled events." [17]

In response the Government denied WSP's request, contending that "the entire Ellipse area is scheduled to be used in conjunction with the Pageant of Peace," [18] and that it would therefore be inappropriate to allow another organization to use a portion of the park. The Government took this position despite the fact that the Christmas Pageant was

11. Brief for appellants at 67.

12. *Cf.* Shuttlesworth v. Birmingham, *supra* note 7, 394 U.S. at 150–151, 89 S. Ct. at 938:

"* * * [I]n deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.' This ordinance as it was written, therefore, fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional. * * *"
(Footnote omitted.)

13. *See* letter from WSP to Regional Director, National Capital Region, National Park Service, Nov. 4, 1968, JA at 97.

14. For a full discussion of the Pageant, *see* Allen v. Hickel, *supra* note 1.

15. See Attachment A to Affidavit of Russell E. Dickenson, General Superintendent, National Capital Parks, National Park Service, JA at 24.

16. *Id.* at 22–23; attachment to deposition of William R. Failor, Superintendent, National Capital Parks, National Park Service, JA at 146.

17. Letter, *supra* note 13, JA at 97.

18. Letter from William R. Failor to WSP, Nov. 27, 1968, JA at 98–99.

to occupy only a small portion of the Ellipse. The Government also chose to ignore WSP's explicit assurance that it would accept a site for its display which in no way interfered with the Pageant.[19]

Moreover, when WSP took steps to circumvent the Government's preemption argument against erection of the display, the Government shifted ground and found other reasons for not granting WSP a permit. Thus, after its initial rebuff, WSP elected to concede for the moment that the Pageant had an exclusive right to use the Ellipse during the Christmas season, and applied for use of the park during the weeks immediately following Christmas.[20] Although no other group was scheduled to use the park at this time, the Government nonetheless again chose to reject the request; this time because erection of displays was not deemed "an appropriate use of Federally-owned park lands and * * * not consistent with the protection and use of the Ellipse area."[21] However, the Government failed to explain why erection of much larger displays by the Christmas Pageant was an "appropriate use of Federally-owned park lands" or why WSP's small structure endangered the "protection and use of the Ellipse area" whereas the Christmas Pageant did not.

After WSP had been rebuffed several more times in its efforts to secure permission to erect its display at various times of the year,[22] it filed this suit in the District Court requesting injunctive and declaratory relief. On July 10, 1969, District Judge Hart granted the Government's motion for summary judgment without filing a written opinion.[23]

On appeal, a panel of this court reversed and remanded the case to the District Court.[24] Speaking for a majority of the panel, Judge Leventhal held that pictorial displays such as that proposed by WSP "have at least a prima facie relevance to freedom of expression,"[25] and that the Park Service "must * * * take into proper account matters that have at least a non-frivolous constitutional aspect, and must take a hard look at them and give them reflective consideration."[26] Judge Leventhal further said that, on the record as it then stood, the Government had failed to show why WSP's display was more objectionable than the structures associated with the Christmas Pageant. The court specifically found that the Christmas Pageant, like the WSP display, "does have, and is intended to have a message, [and] the effort to label it as merely 'recreational,' in the hope that it can be assimilated to the kind of use on the Ellipse illustrated by softball games, is entirely too shallow to support restriction on First Amendment activities."[27] Moreover, the fact that the Christmas Pageant, unlike the WSP display, was co-sponsored by a Government agency was found "not decisive" since it "may raise more questions than it answers."[28]

Nonetheless, Judge Leventhal also recognized that WSP's proposed display contained "non-speech" as well as "speech" elements and that hence "a

19. See letter, supra note 13, JA at 97.

20. See letter from WSP to William R. Failor, Dec. 4, 1968, JA at 99–100.

21. Letter from William R. Failor to WSP, Dec. 18, 1968, JA at 100–101.

22. On Jan. 21, 1969, WSP applied for a permit to erect its display in conjunction with a proposed Easter Pageant of Peace "which would be similar, though smaller in scope, to the Christmas Pageant of Peace." Letter from WSP to William R. Failor, JA at 101–102. On April 25, 1969, WSP filed a similar request to erect its structure in connection with Hiroshima Day (August 6th). See letter from WSP to William R. Failor JA at 104–106.

23. See JA at 12.

24. See Women Strike for Peace v. Hickel, supra note 1.

25. 137 U.S.App.D.C. at 32, 420 F.2d at 600.

26. 137 U.S.App.D.C. at 35, 420 F.2d at 603.

27. 137 U.S.App.D.C. at 34, 420 F.2d at 602.

28. Ibid.

substantial Government interest in regulation of the non-speech element may justify an incidental restriction on First Amendment freedoms." [29] Because the Government had failed to specify what substantial interest it was relying on, the case was remanded so that the Government could reconsider WSP's request in the context of "a more complete and illuminating presentation of Park Service policy than is available on the papers before us." [30]

On remand, disposition of the case was delayed so the Interior Department could revise its regulations in accordance with some coherent park policy respecting exercise of First Amendment rights.[31] In the meantime, at the suggestion of Judge Hart, the Government entered into a stipulation permitting erection of the display on the Ellipse on an interim basis pending the final outcome of the litigation.[32]

After a delay of over a year following this court's remand, the Department of the Interior finally produced its revised regulations in completed form on October 20, 1970. Despite this court's specific warning that Government co-sponsorship was not a "decisive" factor in determining which groups should have access to the parks,[33] the new regulations distinguished sharply between those events which are sponsored by the National Park Service (so-called "NPS events")[34] and those which are not. Thus 36 C.F.R. § 50.19(b) provides:

"Public gatherings, other than NPS events, may be held only pursuant to a valid official permit issued in accordance with the provisions of this section. *NPS events are excepted from the operation of this section. They will not require official permits; may be held in any park area or the White House area; and may preempt any such areas to the exclusion of other public gatherings.*"

(Emphasis added.) Moreover, 36 C.F.R. § 50.19(c) provides that "no * * * structures [other than speaker stands or platforms] * * * may be erected on park lands *except in connection with NPS events.*" (Emphasis added.)

Purporting to rely on these new provisions, the Government proceeded to deny WSP's application [35] for use of a portion of the Ellipse during the 1970- 71 Christmas season. The Government cited three reasons for this refusal [36]—reasons which it now reiterates before this court. First, the Government argued that WSP was attempting to erect a structure unrelated to any "public gathering" within the meaning of 36 C.F.R. § 50.19(c). This section permits erection of speaker stands and platforms "as adjuncts to any permitted public gathering." The Government apparently took the position that the section contains a negative pregnant—forbidding erection of even these limited structures in conjunction with non-NPS events which are not "public gatherings." Next, the Government contended that, even if WSP's proposed display were considered a "public gathering," its erection was still prohibited by 36 C.F.R. § 50.19(c) since the display was not a speaker stand or platform and therefore "may [not] be erected on park land except in connection with NPS events." Finally, the Government argued that 36 C.F.R. § 50.19(b) permits NPS events to preempt an area to the

---

29. 137 U.S.App.D.C. at 33, 420 F.2d at 601.

30. 137 U.S.App.D.C. at 35, 420 F.2d at 601.

31. *See* Women Strike for Peace v. Hickel, *supra* note 3, JA at 26, 27.

32. *See* JA at 2.

33. Women Strike for Peace v. Hickel, *supra* note 1, 137 U.S.App.D.C. at 34, 420 F.2d at 602.

34. *See* 36 C.F.R. § 50.19(a) (5).

35. *See* letter from WSP to Superintendent, National Capital Parks-Central, National Park Service, June 16, 1970, JA at 113–119.

36. *See* letter from William R. Failor to WSP, Dec. 4, 1970, JA at 120–124.

exclusion of other public gatherings. Thus, even if WSP could lawfully erect its display during some other time of the year, it could not use even a portion of the Ellipse during the Christmas season when the Pageant of Peace—an NPS event—had preempted the entire area.

With its administrative remedies exhausted, WSP again turned to the District Court. Appearing before Judge Waddy, the parties offered cross-motions for summary judgment upon which the court ruled on December 14, 1970.[37] Judge Waddy held that the scope of review of administrative regulations was limited to a determination of whether there was a rational basis for them, and that there was a rational basis to believe that the Government's interest in protecting its park land was sufficient to justify an incidental restriction on WSP's First Amendment freedoms.[38] Therefore, the restrictions placed on WSP's use of public park land did not, by themselves, violate the First Amendment. The court further found, however, that it was arbitrary and capricious to exclude WSP's display while allowing the Pageant of Peace to erect a much larger structure, and that this invidious discrimination violated WSP's right to equal protection.[39] Judge Waddy specifically held that there was no rational basis for distinguishing between NPS and non-NPS events.[40] The court therefore granted WSP's motion for summary judgment and enjoined the defendants from refusing WSP permission to erect its display on the Ellipse during the Christmas season.[41]

The Government thereupon filed a timely appeal from this order and, on the Government's motion, this court modified the District Court's order *pendente lite* so as to restrict WSP's display to an alternative site for the 1970-71 Christmas season.[42] This court also granted WSP's motion for a limited and expedited remand to the District Court for the purpose of permitting the District Court to determine whether WSP's display would significantly interfere with the Christmas Pageant of Peace.[43] Pursuant to this remand, Judge Waddy held hearings at which he heard testimony from a member of WSP,[44] the superintendent of the Central District of National Capital Parks,[45] and a psychologist who is a qualified expert in the field of perception mechanisms.[46] At the conclusion of the evidentiary hearing, Judge Waddy announced 19 findings of fact which included, *inter alia,* a finding that "there would be no significant interference with the 1971 Christmas Pageant of Peace if permission were granted for [WSP's] proposal for a public gathering and structure on the Ellipse during the 1971 Christmas season." [47]

This ultimate conclusion was in turn buttressed by a number of subsidiary findings. Specifically, the District Court held that "there is physical space for the simultaneous inclusion of both [WSP's] display and the Christmas Pageant of Peace display on the Ellipse," [48] that "[WSP's] presence on the Ellipse during the 1971 Christmas season would not physically interfere with the visitor's access to the Ellipse for viewing of the Christmas Pageant of Peace," [49] and that "[o]nly those persons who are especially politically sensitive will view [WSP's] proposed display other than as part of the general theme of peace. Such politically sensitive people will in all like-

---

37. *See* Women Strike for Peace v. Hickel, *supra* note 3, JA at 26–35.

38. *See id.* at 31.

39. *See id.* at 32–34.

40. *See id.* at 33–34.

41. *See id.* at 34–35.

42. *See* JA at 137.

43. *See id.* at 36–37.

44. *See id.* at 38–46, 147–150.

45. *See id.* at 47–56, 140–145.

46. *See id.* at 150–173.

47. *See id.* at 59.

48. *See id.* at 58.

49. *See ibid.*

lihood constitute only a small minority of all people who will visit the Ellipse during the Christmas season."[50]

With completion of the evidentiary remand hearing, this case is finally in a posture suitable for review on the merits by this court.[51] After carefully examining Judge Waddy's factual findings and the arguments presented by the parties, I conclude that the District Court was correct in holding that the Government's refusal to permit the WSP display while simultaneously co-sponsoring the much larger Pageant of Peace violated WSP's right to equal protection. I also conclude, however, that the District Court erred in holding that WSP had no First Amendment right to place its structure on the Ellipse.

While the errors in the District Court in no way affect the final outcome of this litigation, they are too fundamental to pass unnoticed. It has always been thought that citizens have an absolute right to speak when their mode of communication in no way interferes with the rights of others. *See, e. g.,* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Gregory v. Chicago, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). *Cf.* Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). If this right could be exercised only when government is willing to offer its co-sponsorship to the speaker, a system of free expression would be indistinguishable from a system of prior restraint. *Cf.* Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951). The First Amendment was not designed to protect the voice of government or government-approved speech. The First Amendment in this country protects the voice of the people, even against government. *See, e. g.,* Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

There can be no ambiguity or doubt about these basic postulates of constitutional democracy. They are far too important—and at the same time far too fragile—for us to stand by while they are whittled away by unreversed dicta. Although the right to equal protection of the laws is vital, it is no substitute for the independent right of free expression. This case therefore should be resolved in accordance with the constitutional provision which was written to deal with such situations. WSP has invoked its right to protest and to petition for redress of grievances. Our court system was created to vindicate just such claims, and any hesitation or equivocation on our part would involve a relinquishment of our constitutional responsibility.

II

Although I reject the Government's argument that it can, under these circumstances, deny WSP access to the Ellipse, I do not mean to suggest that all the constitutional principles governing this area are entirely free from doubt. In fact, the law relating to communicative conduct has developed to the point where a full reconciliation of all the cases is no longer possible. As the law has evolved, it has gradually revealed a basic conflict in attitudes—a conflict which is just beginning to be appreciated. We can be confident in assuming that eventually a new legal theory will emerge from this conflict—a theory which takes full account of society's countervailing

50. *See id.* at 59.

51. This case is not moot. An application for use of the Ellipse for the 1971–72 Christmas season was pending at the time of our order in this case. *See* letter from WSP to Superintendent, National Capital Parks-Central, National Park Service, June 25, 1971, JA at 131–133. Moreover,

"[w]hen controversies present what are essentially recurring issues of public interest they are not mooted because the most recent particular occasion for consideration of the issue has come and gone." Women Strike for Peace v. Hickel, *supra* note 1, 137 U.S.App.D.C. at 36, 420 F.2d at 604.

interests in full discussion and public order. In the meantime, there remains a hard core of shared premises which must form the basis of any new theory and which are sufficient for resolution of the case before us.

Thus, while the law of symbolic speech as a whole is unclear and rapidly changing,[52] the law upon which this case rests is clear and immutable. But, ironically, it is necessary to have some appreciation of the area of conflict before we can hope to understand the area of certainty. This conflict has its genesis in the gradual deterioration of the once clear distinction between speech on the one hand and conduct on the other. For years, most scholars have agreed that "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation" on speech,[53] while conduct may be regulated much more freely, so long as government remains within the loose bounds of rationality. This dichotomy was thought basic to First Amendment analysis. Professor Emerson, for example, thought that "[t]he first task is to formulate in detail the distinction between 'expression' and 'action.' * * * [T]he whole theory and practice of freedom of expression—the realization of any of the values it attempts to secure—rests upon this distinction." Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 917 (1963).

In recent years, however, it has become apparent that, if there is such a distinction, it is often one without a difference. Thus the Supreme Court found a peaceful demonstration in front of the state legislature in Edwards v. South Carolina to be "an exercise of [free speech] in [its] most pristine and classic form,"[54] whereas the peaceful demonstration in front of the state courthouse in Cox v. Louisiana was "not

* * * free speech alone, but * * * expression mixed with particular conduct."[55] There may in fact be important differences between demonstrating before a legislature and demonstrating before a courthouse, but these differences clearly do not correlate with the differences between speech and conduct—at least as those terms are used in common parlance. Nor are these terms, as commonly used, responsive to the interests which the First Amendment was designed to protect. Thus we would say in ordinary conversation that a man making an obscene telephone call is "speaking" whereas a man distributing handbills is "acting." Yet in this situation, it is surely the act rather than the speech which should be protected.

It may be, of course, that advocates of the speech-conduct dichotomy mean those terms to be understood in a special, legal sense rather than as used in common parlance. Professor Emerson, for example, has attempted to draw a functional line between speech and conduct. The harm attributable to "action," he says, is "immediate and instantaneous" and "irremediable except by punishing and thereby preventing the conduct." Emerson, op. cit. *supra*, 72 Yale L.J. at 917. Speech, on the other hand, "has less immediate consequences, is less irremediable in its impact." *Id.* at 881. There are, in fact, some indications that the Supreme Court has made just such a distinction in a number of recent opinions. When the speaker has engaged in "conduct"—that is, when his actions create a direct and irremediable impact which the state has a right to prevent—he can be punished or restrained. But when he is engaged in speech—that is, when his actions do not immediately invade any legitimate government interest and presumably involve little or no societal costs—a far stronger showing

---

52. *See generally* Note, Symbolic Conduct, 68 Colum.L.Rev. 1091 (1968).

53. Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

54. Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

55. Cox v. Louisiana, *supra* note 7, 379 U.S. at 564, 85 S.Ct. at 480, 13 L.Ed. 2d 487.

must be made before government may constitutionally impose restraints. *Compare, e. g.,* Tinker v. Des Moines Independent Community School District, *supra, with* Barker v. Hardway, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969) (Mr. Justice Fortas, concurring). *See generally* Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

The difficulty with such an approach, however, is that when carefully examined it tends to turn all speech into conduct. All communication imposes some direct costs on a society which chooses to tolerate it. "If it is oral, it is noise and may interrupt someone else; if it is written, it may be litter." Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 23. All demonstrations destroy grass,[56] and all newspapers cause pollution.[57] There is simply no way in which we can have a thoroughgoing system of free expression while paying no societal costs for our freedom:

> " * * * [T]he process of full discussion, open to all, involves some risks to the society that practices it. At times there may be substantial delay in the working out of critical problems. There can be no ironclad guarantee that in the end a decision beneficial to society will be reached. The process, by encouraging diversity and dissent, does at times tend to loosen the common bonds that hold society together and may threaten to bring about its dissolution. The answer given is that the stakes are high and that the risks must be run. * * * "

Emerson, op. cit. *supra*, 72 Yale L.J. at 886.

It is clear, then, that virtually all communication—from the faintest whisper to a large demonstration—is a compound of "speech" and "conduct." The real issue in most symbolic speech litigation concerns the amount of inimical conduct the state must tolerate in the interest of allowing free communication. Obviously, it is insufficient for government to point to any legitimate interest at all, no matter how minor or remote, as a justification for suppression of communicative conduct. A long line of cases establishes that the countervailing governmental interest must reach a certain threshold level before regulation having an incidental effect upon speech will be permitted. Thus, in Schneider v. State,[58] the Supreme Court was faced with a group of narrowly drawn statutes prohibiting distribution of handbills in certain public places. The various cities asserted in justification for the ordinances the obviously valid state interest in preventing littering. Writing for the Court, Mr. Justice Roberts took cognizance of this interest, but found it insufficient to justify the incidental effect the ordinance had on free expression:

> "In every case * * * where legislative abridgment of the rights [of free expression] is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." [59]

Nor is *Schneider* an isolated aberration. At various times the Supreme Court has subordinated legitimate state

---

56. *Cf.* A Quaker Action Group v. Hickel, *supra* note 1, 137 U.S.App.D.C. at 182, 421 F.2d at 1117.

57. *Cf.* Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

58. *Ibid.*

59. *Id.* at 161, 60 S.Ct. at 151.

interests in traffic control,[60] revenue raising,[61] crime prevention,[62] licensing of occupations [63] and noise control [64] to protection of First Amendment values. The validity of the statutes involved when applied to noncommunicative conduct did not save them when they conflicted with communicative interests. Thus, in Murdock v. Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943), the fact that a licensing tax was "nondiscriminatory" was held to be "immaterial":

> " * * * The protection afforded by the First Amendment is not so restricted. A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of press, freedom of speech, freedom of religion are in a preferred position."

It should be clear then that government may not regulate communicative conduct simply because the conduct imposes costs which society would have a right to avoid if they were not linked with constitutionally protected communication. Congress is empowered to protect our parks from harm under normal circumstances, for example, but "the need to protect plants and shrubbery cannot alone justify restrictions of the sort imposed upon demonstrations in Lafayette Park." A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 182, 421 F.2d 1111, 1117 (1969). State legislatures have ample power to set professional qualifications for lawyers, but when the otherwise legitimate regula-

tions interfere with First Amendment rights, "it is no answer * * * to say * * * that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression. For a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." N.A.A.C.P. v. Button, 371 U.S. 415, 438–439, 83 S.Ct. 328, 341, 9 L.Ed. 2d 405 (1963). See also Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480 (1960); N.A.A.C.P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

But while I can agree with Mr. Justice Douglas that First Amendment freedoms should not be classified "along with the wares and merchandise of hucksters and peddlers," Murdock v. Pennsylvania, supra, 319 U.S. at 115, 63 S.Ct. at 876, I must also agree with Mr. Chief Justice Hughes that "[o]ne would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions." Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). It cannot be that speech may be curtailed every time the state can point to a legitimate governmental interest which would otherwise justify regulation since, as shown above, all speech to some degree imposes societal costs and hence invades governmental interests. But neither can it be true that the Constitution permits anyone to do anything at any time so long as he acts in the name of free expression. See Adderley v. Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The problem in every case is

60. See Jamison v. Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943). But cf. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

61. See Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Cf. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

62. See Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). But cf. Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951).

63 See Thomas v. Collins, supra note 53.

64. See Saia v. New York, supra note 7. But see Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

to strike a principled balance between the right of the individual to communicate his views and the right of the state to control the "conduct" aspect of that communication.

The Supreme Court has now provided a preliminary test for weighing these rights in conflict:

"* * * [W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. * * *"

United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). (Footnotes omitted.)

It is at least clear, then, that the countervailing governmental interest must be "important" or "substantial" before government regulation incidentally affecting speech will be permitted. It should be noted, however, that this test must be regarded as preliminary only, since it fails to resolve close cases. Specifically,

it begs the question of how "substantial" the governmental interest need be before regulation will be permitted. The governmental interest in prosecuting draft card forgers [65] and in maintaining prison security [66] seems to be "substantial." Governmental interests in preventing littering [67] and regulating advertisers [68] are apparently "insubstantial." But how does one tell a substantial interest from one which is something less than substantial? Is fire prevention, for example, a substantial enough interest to justify a prohibition against flag burning? [69] Is the state's interest in school discipline substantially impaired by permitting students to wear armbands? [70] It is virtually impossible to derive principled answers to these questions. The basic issue in all such cases is how much the First Amendment requires society to give up in the interest of communication—that is, what price we are willing to put on free speech. In the long run, it will not do to say that we must pay a "substantial" price, since this answer does not tell us just how substantial the price must be. The *O'Brien* test works well at the extremes, but it may be that a new test will have to be devised for governing the close cases.

In the meantime, courts have relied on a number of principles which are sufficient to resolve many of the cases. The most important of these is the one explicated and relied upon by the *O'Brien* Court itself. Whatever one's view as to the price which must be paid for First Amendment freedoms, it should at least be clear that government must show *some* interest which it seeks to vindicate by suppression of the communication. Moreover, this interest must have independent validity and must be unrelated

65. *See* United States v. O'Brien, *supra* note 10.

66. *See* Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

67. *See* Schneider v. State, *supra* note 57.

68. *See* Martin v. City of Struthers, *supra* note 62.

69. *Cf.* Street v. New York, 394 U.S. 576, 615, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (Mr. Justice Fortas, dissenting).

70. *Cf.* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

to suppression of speech *per se*—a goal which the First Amendment prohibits government from pursuing. *See* United States v. O'Brien, *supra*, 391 U.S. at 376–377, 88 S.Ct. 1673. *Cf.* Stanley v. Georgia, *supra*.

Of course, this principle alone does not fully protect First Amendment freedoms since, as argued above, virtually all speech imposes costs which society has an interest in preventing. However, the principle also has a number of important corollaries which extend its sweep somewhat more broadly. First, it follows from the requirement of an independent countervailing interest that the state must pursue a less restrictive alternative if possible before it curtails communicative conduct. *See* United States v. O'Brien, *supra;* United States v. Robel, 389 U.S. 258, 267–268, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). If the state could achieve all its legitimate goals by a regulation which does not curtail speech, then it cannot be said to have a legitimate interest in regulating speech.

It must be conceded that some of the ambiguity of the *O'Brien* test itself inheres in this corollary to it. It could be argued with some force that the state could always devise a "less restrictive alternative" if societal costs were not a consideration. What the test must mean, therefore, is that the state must use a less restrictive alternative if it can do so without incurring *substantial* costs. But this formulation returns us to our original difficulty in determining how substantial a "substantial" cost must be. Without attempting to resolve this dilemma, we can at least say that the state should not be permitted to regulate speech when it can achieve all its legitimate goals by some other regulation *at very little or no extra cost*.

A second corollary to the legitimate independent interest test is that when the state allows one group to use a facility for expression of views it must allow all other groups a similar opportunity. *See, e. g.,* Cox v. Louisiana, *supra,* 379 U.S. at 557, 85 S.Ct. 453; Hague v. C. I. O., *supra,* 307 U.S. at 505–506, 59 S.Ct. 954. A moment's reflection reveals why this should be so. The only reason why the courts will permit a restriction on communicative conduct is because the state has asserted an independent legitimate interest which can be vindicated only by such a restriction. But if the state has allowed some to invade that interest, it is obvious that the purpose of a restriction on others is to suppress their speech rather than to vindicate any independent interest.

Thus, in Niemotko v. Maryland, *supra,* for example, the state asserted an independent legitimate interest, similar to the one asserted in this case, in keeping its parks tranquil and quiet. But "whatever force this contention could possibly have is lost in light of the testimony * * * at the trial that * * * permits had always been issued for [other] religious organizations and Sunday-school picnics. We might also point out that the attempt to designate the park as a sanctuary for peace and quiet not only does not defeat these appellants, whose own conduct created no disturbance, but this position is also more than slightly inconsistent, since, on the first Sunday here involved, the park was the situs for the Flag Day ceremony of the Order of Elks." [71] The discriminatory assertion of an independent interest makes clear that the state's real concern is with regulation of the content of speech rather than regulation of conduct. Such a purpose is one which the First Amendment prevents the state from pursuing, and therefore the regulation in question must fall.

Moreover, the legitimate independent interest test requires not only that the regulation of speech be narrowly drawn and fairly applied. The standards contained in the regulation must also be precisely worded and specifically directed toward identifiable abuses.

"  *  *  *  Even when the use of its public streets and sidewalks is involv-

71. Niemotko v. Maryland, *supra* note 7, 340 U.S. at 272–273, 71 S.Ct. at 328.

ed, * * * a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community."

Shuttlesworth v. Birmingham, 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969). A loosely worded statute or ordinance giving the enforcing authority wide discretion creates an unacceptable risk that the rule will be applied so as to regulate the content of the speech rather than the mode of expression. An official who can grant or deny the right to speak according to what he deems to be in the "public interest" is indistinguishable in all relevant respects from a censor. A long line of Supreme Court cases holds that such prior restraint without adequate standards is precisely the sort of abuse against which the First Amendment was primarily directed. *See, e. g.,* Shuttlesworth v. Birmingham, *supra;* Niemotko v. Maryland, *supra,* 340 U.S. at 271, 71 S.Ct. 325; Saia v. New York, 334 U.S. 558, 559–601, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938). If the state wishes to regulate speech, then it must undertake the burden to show a precise nexus between that speech and some evil which the state has a right to prevent. Without narrowly drawn standards judicial review to insure the existence of such a nexus is impossible, and if the First Amendment means anything at all it requires at least that a party be given a judicial determination that such a nexus exists before the state can silence him. *See* Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Finally, there is a separate group of considerations which, while not flowing directly from the independent legitimate interest test, nonetheless have a bearing on this case. These considerations cannot be said to form a part of any coherent philosophy or approach to the First Amendment or to follow inexorably from prior premises. They are, instead, a part of the evolving common law of First Amendment adjudication, based primarily on custom and on *ad hoc,* commonsense accommodations which have had to take the place of an all-embracing theory. But although these rules have been developed on a case-by-case basis and must usually be limited to their facts, there are now enough of them to cover a good deal of at least the more typical sort of First Amendment problems. It has been established, for example, that handbilling in a downtown area must be allowed,[72] while picketing, in some situations at least, can perhaps be prohibited altogether,[73] and that the grounds of a state capitol is an appropriate place to hold a demonstration [74] while the jailhouse [75] and courthouse [76] are inappropriate.

It would serve no purpose to try to put such rules into a coherent pattern or to extend them to cover new cases. Rather, they must be recognized and utilized for what they are: a group of useful aids derived from the community's admittedly vague sense of what might be called First Amendment etiquette. For our purposes, it is sufficient to note that three of these rules have a direct bearing on this case. First, it seems to make an important difference whether the area chosen for the demonstration is generally open to the public. Thus, in Adderley v. Florida, *supra,* the Supreme Court found it necessary to point out:

"* * * In *Edwards,* the demonstrators went to the South Carolina

---

72. *See* Schneider v. State, *supra* note 57.

73. *Cf.* Cox v. Louisiana, *supra* note 7, 379 U.S. at 581, 85 S.Ct. 453 (Mr. Justice Black, concurring and dissenting).

74. *See* Edwards v. South Carolina, *supra* note 54.

75. *See* Adderley v. Florida, *supra* note 66.

76. *See* Cox v. Louisiana, *supra* note 7.

State Capitol grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. * * * " [77] Similarly, in Brown v. Louisiana,[78] while the Court upheld the right of blacks to demonstrate in a public library, the author of the opinion subsequently explained that the result "might well have been different" if the demonstrators had entered the library after closing time. *See* A. Fortas, Concerning Dissent and Civil Disobedience 16 (1968).

Second, the opinions clearly establish that, in the spectrum of appropriateness, parks are much more like state capitol grounds than they are like jails and courthouses. Parks have long been regarded as "a particular kind of community area that, under the Anglo-American tradition, are available, at least to some extent and on a reasonable basis, for groups of citizens concerned with expression of ideas." Women Strike for Peace v. Hickel, 137 U.S.App. D.C. 29, 32, 420 F.2d 597, 600 (1969). After a false start in Davis v. Massachusetts,[79] the Supreme Court has been consistently solicitous of the claims of groups seeking to use parks for religious or political expression. *See, e. g.,* Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) ; Niemotko v. Maryland, *supra*; Saia v. New York, *supra.* Moreover, this solicitude has extended to erection of temporary structures on park land for use in connection with communicative activity. *See* Saia v. New York, *supra.*

It should be noted too that the courts have in the past been particularly sympathetic with groups which have asserted a right to demonstrate as close as possible to the seat of government. "The general concepts of First Amendment freedoms are given added impetus as to speech and peaceful demonstration in Washington, D. C., by the clause of the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances." A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 351, 460 F.2d 854, 859 (1971). There is an unmistakable symbolic significance in demonstrating close to the White House or on the Capitol grounds which, while not easily quantifiable, is of undoubted importance in the constitutional balance. Although this theory has been used to justify demonstrations near state capitols as well, *see* Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), it is in Washington—where a petition for redress of national grievances must literally be brought—that the theory has its primary application. *See, e. g.,* A Quaker Action Group v. Hickel, 139 U.S.App.D.C. 1, 429 F.2d 185 (1970) ; Jeannette Rankin Brigade v. Chief of the Capitol Police, 137 U.S.App.D.C. 155, 421 F.2d 1090 (1969) ; United States v. Nicholson, D.C.C.A., 263 A.2d 56 (1970).

### III

With this constitutional background, we can begin to evaluate WSP's contention that it has a right to place its display on the Ellipse. Such an evaluation must, in turn, start with the observation that WSP's proposed display constitutes a form of communicative conduct. As we pointed out in our first opinion, "Certainly pictorial displays have at least a prima facie relevance to freedom of expression." 137 U.S.App.D.C. at 32, 420 F.2d at 600. WSP's display is similar to the red flag in Stromberg v. California,[80] the picket sign in Thornhill v. Alabama,[81] and the black arm band in Tinker v. Des Moines Independent Community School District [82] in that it is a

77. 385 U.S. at 41, 87 S.Ct. at 244.

78. 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed. 2d 637 (1966).

79. 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71 (1897).

80. 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

81. 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

82. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

device designed to communicate views on matters of public importance. It may be true that erection of a display is not what one would call prototypical First Amendment activity or precisely the mode of expression which the framers of the Bill of Rights envisioned. But it is a vehicle for expression of views nonetheless and, hence, entitled to a degree of First Amendment protection. In this connection, it is worth keeping in mind Mr. Justice Black's warning that "[t]here are many people who have ideas that they wish to disseminate but who do not have enough money to own or control publishing plants, newspapers, radios, moving picture studios, or chains of show places." Kovacs v. Cooper, 336 U.S. 77, 102, 69 S.Ct. 448, 461, 93 L.Ed. 513 (1949) (dissenting opinion).

Moreover, the fact that the proposed display does not fit within the Interior Department's definition of a "public gathering" [83] in no way detracts from its First Amendment character. It has never been thought that citizens must gather together in order to enjoy the benefits of free expression. Indeed, the primary force of the First Amendment is directed toward activities such as reading, writing and thinking which are typically conducted in solitude. An individual's claim to First Amendment protection is at its strongest when he is in the privacy of his own home, far removed from the bustle of "public gatherings." Cf. Stanley v. Georgia, supra. It follows that, the Government's position to the contrary notwithstanding,[84] WSP's right to erect its display is in no way diminished by its failure to propose a "public gathering" incident to that display. Indeed, if this factor has any relevance at all, it strengthens WSP's argument since a public gathering accompanying the display would impose greater societal costs than would the display alone.

It should also be noted that WSP's claim is further strengthened by the ad hoc, "common law" considerations discussed above. It proposes to erect its temporary structure in an area out of doors in a public park, the sort of area customarily devoted in part to First Amendment activity.[85] Parks have been used "time out of mind" [86] for airing of grievances and expression of views. Indeed, the words "Hyde Park" have now passed into the language as a name for any location or medium customarily used for speaking and debating public issues. And of course the Ellipse is a particularly appropriate site for WSP's display inasmuch as it is in the immediate vicinity of the White House—the place to which WSP's message is primarily directed. Cf. A Quaker Action Group v. Morton, supra.

Nonetheless, it must be conceded that WSP's proposal, like virtually all proposals for exercise of First Amendment rights, involves not speech alone, but conduct mixed with speech. Under the legitimate independent interest test outlined above, the Government may regulate the conduct aspect of WSP's activities if it can show a valid reason for doing so. Moreover, it is permissible for such regulation to curb the speech aspect of the activities if the Government can show that the countervailing interest is "important" or "substantial." [87]

The Government purports to meet this test by pointing to two sorts of substantial interests which it fears would be invaded if WSP is permitted to erect its display. First, the Government argues that erection of a display on park land would interfere with its ecological and aesthetic interests in preserving parks as unspoiled areas for quiet and contemplation. Second, it is contended that erection of the display during the Christmas season would interfere with the ongoing Christmas Pageant of Peace

83. See 36 C.F.R. § 50.19(c).

84. See text at note 36 supra.

85. See text at notes 78–79 supra.

86. Hague v. C. I. O., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

87. See text at notes 58–70 supra.

which, under Government regulations, is entitled to preempt the entire Ellipse area for its exclusive use.

I do not question the Government's legitimate interest in preserving the unspoiled nature of its parks and in co-sponsoring a national Christmas celebration on the Ellipse. Nor do I wish to engage in a quibble over whether such interests can be denominated as "important" or "substantial," although it may be worth noting in passing that the Supreme Court could hardly have had erection of Christmas trees in mind when it said that First Amendment freedoms could be infringed when they conflicted with substantial governmental interests.[88] But I do reject categorically the Government's suggestion that mere invocation of these interests is a complete argument stopper. It has long been clear that the courts must examine for themselves the supposed nexus between First Amendment activity and a harm which government has a right to prevent. *See, e. g.*, New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Cox v. Louisiana, *supra*, 379 U.S. at 551, 85 S. Ct. 453. The Government must make a "specific showing of constitutionally valid reasons to regulate * * * speech." Tinker v. Des Moines Independent Community School District, *supra*, 393 U.S. at 511, 89 S.Ct. at 739. Moreover, "in our system, undifferentiated fear or apprehension * * * is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. at 737.

A panel of this court has recently held that mere assertion of an interest in protecting the safety of the President is not sufficient to justify curtailment of free expression. A Quaker Action Group v. Morton, *supra*. The panel forthrightly rejected the Government's argument that "the controlling judgment is that of the Secretary, and that this is conclusive if supported by substantial evidence," holding instead that "the balancing of First Amendment freedoms against safety requirements require[s] the judgment of the court." 148 U.S. App.D.C. at 351, 460 F.2d at 859. If the judiciary is competent to evaluate the force of the Government's asserted interest in so sensitive an area as protection of the Chief Executive, then surely judges can also decide for themselves the extent to which First Amendment activity will interfere with erection of a Christmas tree. The District Court therefore erred in ruling that these regulations are immune from First Amendment challenge if they are "not arbitrary and capricious" and have "a basis in fact."

We have thus examined on our own the nature of the nexus which the Government alleges between erection of the WSP display and invasion of substantial governmental interests. I find that the Government has failed to prove that any such nexus exists.[89] It follows that the contested regulation is an unjustified interference with WSP's constitutional rights and, hence, is invalid.

88. The sorts of interests which the Supreme Court has found "substantial" in the past have included the state's interest in raising an army (United States v. O'Brien, *supra* note 10) ; protecting the integrity of the judicial system (Cox v. Louisiana, *supra* note 7) ; and assuring the security of its prisons (Adderley v. Florida, *supra* note 66).

89. This case is thus clearly distinguishable from Jones v. District of Columbia Armory Board, 141 U.S.App.D.C. 297, 438 F.2d 138 (1970). In that case a political group was denied access to the Dis-

trict Armory for its meetings. A panel of this court upheld the denial over First Amendment challenge because "[t]here was a substantial showing that the use by any outside organization of any portion of the Armory at the time the Guard is called upon to act in maintaining public order would interfere with the functioning of the Guard." 141 U.S.App.D.C. at 298, 438 F.2d at 139. Here, in contrast, a substantial showing was made that the WSP display would create no interference with simultaneous use of the Ellipse by the Christmas Pageant of Peace. *See* text at notes 94–97 *infra*.

## A

In light of the Park Service's co-sponsorship of the Christmas Pageant of Peace, I cannot accept the Government's contention that erection of the WSP display would substantially interfere with legitimate park values. The District Court was correct in holding that the Government's decision to allow the Christmas Pageant permission to erect displays on the Ellipse while denying such permission to WSP constituted invidious discrimination which is violative of equal protection. Since regulation of use of park land for speech and debate trenches upon constitutional rights, any classifications created are subject to strict scrutiny. *Cf.* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Applying such scrutiny to this classification, I can see no constitutional basis for making a distinction between the WSP display and the Christmas Pageant display. It follows under familiar equal protection principles that the Government cannot deny use of the Ellipse to WSP while it permits similar use by the Christmas Pageant.

But in holding that the Government's action here violated the equal protection clause, the District Court neglected to observe that the inequality in treatment is also relevant to WSP's First Amendment argument—not because the treatment is unequal *per se*, but because that inequality undermines the Government's contention that it has a substantial and legitimate interest which would be invaded by erection of displays in the Ellipse area. The Government can hardly argue that the WSP display would irreparably destroy basic park values when it has willingly served as the co-sponsor of a substantially similar display erected by the Christmas Pageant. It may in fact be constitutional for the Government to set aside the Ellipse area as a sanctuary in which no structures of any kind may be built, although it is unnecessary for us to reach this question here. It is clearly unconstitutional, however, for the Government to permit groups with one ideology to erect displays while denying such permission to groups with less popular views. *See, e. g.,* Niemotko v. Maryland, *supra.* Such discrimination constitutes the sort of regulation of ideas which is impermissible under even the most narrow construction of the First Amendment.

Of course, it would be permissible for the Government to discriminate between WSP and the Christmas Pageant if it succeeded in making some showing that one display imposed greater societal costs than the other and if it relied on some narrow regulations precisely drawn to prevent incurrence of these costs. *See, e. g.,* Cox v. New Hampshire, *supra.* It would be permissible, for example, for the Government to limit use of the Ellipse to certain hours or to regulate the size or aesthetic character of displays built on park land. Indeed, our previous remand was premised on the hope that the Government would develop a set of such narrow regulations as part of a coherent park policy. The Government elected to disdain any such approach, however, and instead chose to rely entirely on the fact of Government co-sponsorship to categorize various applications. Thus all displays built in conjunction with NPS events are permitted while those erected by entirely private groups are forbidden. This approach is tantamount to saying that only the official voice may be heard—a position which is patently inconsistent with the Constitution. First Amendment protection has never been thought to be the exclusive prerogative of those who express views meeting the approval of some government functionary.

Of course, if the Government's contention were correct that co-sponsorship under the regulation operated as merely an alternative form of licensing of the type which the Supreme Court has repeatedly sustained, there would be nothing constitutionally objectionable about it. The outcome of this case should turn on the substantive rights of the parties involved rather than on the labels which are attached to those rights. It should be

noted, however, that "co-sponsorship" is a particularly inappropriate label to attach to a regulatory scheme since it implies governmental approval of the ideas being expressed—a standard which can play no role in a constitutional licensing system. Moreover, even if we ignore the label attached to it, this form of licensing fails to pass constitutional muster. Licensing systems are only permissible when they are administered under narrowly drawn regulations providing appropriate standards which, *inter alia*, pinpoint precisely the legitimate governmental interest to be protected. Licenses must be granted promptly to all those demonstrating that they will not infringe those interests, and quick judicial review must be assured. Without such protection, there is too great a danger that front line officials will use their discretion to regulate views rather than to regulate the mode in which those views are expressed. "Although this Court has recognized that a statute may be enacted which prevents serious interference with normal usage of streets and parks, * * * we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." Kunz v. New York, *supra*, 340 U.S. at 293–294, 71 S.Ct. 312, at 315.

This protection necessary to make a licensing system proper is sorely lacking here. There is no indication that selection of those events which are to receive NPS cosponsorship or license is made in accordance with narrowly drawn criteria announced in advance. Rather, the decision as to which events are to receive government blessing seems to be left entirely in the discretion of the officials who administer the regulations. To be sure, those officials assure us that the discretion is exercised with an eye to the public interest and basic park values. But the Supreme Court has repeatedly held that such standards, even with official assurances of good faith, offer insufficient protection to First Amend-

ment freedoms. *See, e. g.,* Shuttlesworth v. Birmingham, *supra.*

Belatedly sensing that the fact of NPS co-sponsorship hardly aids its case, the Government now presses another distinction between the Christmas Pageant and the WSP display. The Christmas Pageant, the Government argues, is nonpolitical and nonpartisan. The WSP display, on the other hand, is a device for communicating a partisan political "message." This argument need not detain us, however. In the first place, the distinction between "political" and "apolitical" displays is nowhere contained in the regulations upon which the Government purported to rely when it denied WSP's application. The Government can hardly be permitted to make up the law as it goes along. If the Park Service wished to deny use of the parks to those with political messages, it should have said so in the regulations supposedly governing park use applications.

Moreover, even if such a provision were contained in the regulation, I am far from convinced of its constitutional validity. It is well established that government may not place an added burden on conduct simply because it constitutes an exercise of a constitutional right. Thus it is obviously impermissible for the Government to deny WSP's application for the very reason that its proposed display is First Amendment activity. It may be, of course, that WSP's First Amendment conduct would impose some additional societal costs not imposed by nonspeech activity. But the burden is on the Government to demonstrate such additional costs and to tailor regulations narrowly designed to prevent them without interfering with the exercise of WSP's First Amendment rights. As argued above, the Government has not begun to meet this burden here.

Finally, I reject the underlying premise of the Government's argument. It is simply not true that the Christmas Pageant is totally apolitical and nonpartisan. Indeed, it is surprising that the Government chooses to renew this contention after our first decision in this

case. In that decision, we explicitly held that the Christmas Pageant "plainly does have, and is intended to have, a message [. T]he effort to label it as merely 'recreational,' in the hope that it can be assimilated to the kind of use on the Ellipse illustrated by softball games, is entirely too shallow to support restriction on First Amendment activities." 137 U.S.App.D.C. at 34, 420 F.2d at 602. Nothing added to the record since our first remand has caused me to change this view.[90]

I am thus unpersuaded that any legitimate governmental interest in maintenance of park values would be undermined by WSP's display. It does not automatically follow, however, that the display should be permitted, since the Government asserts another, analytically separable, interest which it claims to be protecting. Specifically, the Government argues that it has an interest in regulating competing First Amendment activities so that they do not interfere with each other. In support of this argument the Government cites that portion of the regulations permitting an NPS event to "preempt" an entire park area for its duration.[91]

As indicated above, the Christmas Pageant of Peace is unmistakably designed to communicate a "message" and to further a particular point of view. Therefore, the Pageant, like the WSP display, is entitled to a degree of First Amendment protection. Part of that protection is the opportunity to communicate free from interference from others wishing to propagate other views. Government regulation of the airwaves, for example, is premised on the belief that if everyone talked at the same time over the same medium, no one would be

heard and the ultimate policy of the First Amendment would be frustrated. See National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L. Ed. 1344 (1943). As Professor Kalven has convincingly argued, it is quite proper for government to insure that two speakers do not attempt to speak at the same place and the same time so long as the government regulations designed to achieve this end are narrowly drawn and scrupulously fair. See Kalven, op. cit. supra, 1965 Sup.Ct.Rev. at 23–27.

Thus if this were a case where the Government attempted to apply a precise and fairly administered regulation in order to prevent substantial interference with the Christmas Pageant of Peace, I would be forced to reject WSP's claim. The Supreme Court has emphatically discredited the notion that "people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." Adderley v. Florida, supra, 385 U.S. at 48, 87 S.Ct. 242, at 247. WSP has a right to speak equal to the right of the organizers of the Christmas Pageant, but neither has the right to shout down the other.

Unfortunately, however, it requires a rather creative imagination to turn this case into one in which government merely acts as a traffic patrolman, making certain that everyone gets a fair chance to speak. In the first place, it can hardly be maintained that these regulations meet the test of scrupulous evenhandedness required when government regulates First Amendment activity. The analogy to broadcast regulations is again instructive. The Supreme Court has approved government regulation designed to insure that two broadcasters do not

90. Moreover, my opinion in this regard is strengthened by new evidence inserted in the record after remand indicating that the Christmas Pageant has been used to promote the Government's view about the prisoners of war held in North Vietnam. See JA at 141–145. Not only is the POW issue plainly partisan and political; it is also an aspect of the very same controversy about which WSP wishes to ex-

press its views. Clearly, the Government cannot be permitted to exclude others from expressing their views on a matter of controversy while using the same medium to advance its own position. Cf. Wirta v. Alameda-Contra Costa Transit District, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (1967).

91. 36 C.F.R. § 50.19(b).

attempt to use the same wavelength at the same time. But before doing so, the Court assured itself that "Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views, or upon any other capricious basis. If it did, or if the Commission by these Regulations proposed a choice among applicants upon some such basis, the issue before us would be wholly different." National Broadcasting Co. v. United States, *supra*, 319 U.S. at 226, 63 S.Ct. at 1014.

Here, however, the Government's regulations do discriminate between applicants on a constitutionally unacceptable basis. Whereas all other events require permits before they can be held, NPS events are permitted to proceed without a permit.[92] Furthermore, NPS events —unlike all other events—are permitted to preempt an entire park area.[93] Taken together, these two provisions mean that the Government-sponsored displays are always given preference over other displays which do not meet with the approval of Government officials. Such discrimination cannot be analogized to evenhanded enforcement of the rules of the road. It constitutes instead the kind of blatant government censorship which the framers of the First Amendment intended to outlaw forever.

Moreover, even if these regulations were facially nondiscriminatory, they would still be overbroad as applied and therefore violative of the requirement that the least restrictive method be used when First Amendment rights are regulated. *See* United States v. O'Brien, *supra*, 391 U.S. at 377, 88 S.Ct. 1673; United States v. Robel, *supra*, 389 U.S. at 267–268, 88 S.Ct. 419. It is true that government may curb the communication of one speaker so that another can have his chance. But any such restriction on the right to express views must be narrowly drawn so as to infringe on First Amendment rights only to the extent necessary to vindicate the rights of others.

It is no doubt true, for example, that a political convention is protected activity and that a local government would be within its rights if it designated a particular hall for the exclusive use of a political party during convention week. But it hardly follows from this proposition that the government could decide that the convention "preempted" the entire city and that all other speech was therefore illegal while the convention was in town. By the same token, the Government may preempt a portion of the Ellipse large enough to insure that other activities do not substantially interfere with the ongoing Christmas display. But it may not preempt the entire Ellipse when only a partial preemption would fully vindicate its interest in having an unobstructed Pageant. A total preemption in this situation would constitute an infringement of First Amendment rights without any countervailing governmental interest since, by hypothesis, the countervailing interest is fully vindicated by a partial preemption.

The extent to which a particular display requires preemption of the land surrounding it is a question of fact, depending on the nature of the display and the nature of the competing activities. It is, moreover, a difficult and subtle question of fact. Obviously, more is involved than a mere determination of what will physically fit on the land in question. The Christmas Pageant is in part an aesthetic event, and the beauty of the scene could easily be ruined by certain types of competing displays even if located some distance from the Pageant itself. On the other hand, it is also possible to imagine how an unobtrusive, tasteful structure suitably removed from the center of the Pageant might go almost unnoticed or might blend in with the other displays associated with the Pageant.

Fortunately, it is unnecessary for me to decide as a matter of first impression which of these prototypes is closest to this case, since the District Court held

---

92. *See ibid.*

93. *See ibid.*

a thorough hearing on this very issue, at the conclusion of which Judge Waddy made detailed findings of fact.[94] In particular, Judge Waddy found that the WSP display would not substantially interfere with the Pageant, either aesthetically or physically.[95] My independent perusal of the record convinces me that these findings are not clearly erroneous. Indeed, I find myself in complete accord with them. The Ellipse is a large geographic area which remains uncrowded even when the entire Christmas Pageant —reindeer, Yule log and all—has been assembled on it.[96] In contrast, the WSP display is quite modest in its dimensions. The evidence indicates that many visitors to the Ellipse would not even know it was there, and that most others would assume it was merely a part of the general Christmas display.[97] Accordingly, I see no reason why, in the spirit of the season, the Christmas Pageant and the WSP display cannot, as the District Court held, coexist peacefully on the Ellipse.

Of course, I have no doubt that a few people will be surprised to come upon the WSP display. A few others, I am sure, will be annoyed by the message it conveys. But in a country as diverse as ours, there will be a few who are surprised and annoyed by any message of substance. Indeed, it is a function of speech to surprise and annoy. "It may * * * best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 896, 93 L.Ed. 1131 (1949). We pay a price for the right to speak—a price which can be measured in the hard currency of rage, instability and inconvenience. But the wisest men are sometimes those who gladly pay the piper. The full cost of repression and uniformity would be far greater and, ultimately, would be more than any of us would like to bear.

For the reasons stated in this opinion rather than those given by the District Court, I concur in the affirmance of its judgment.

LEVENTHAL, Circuit Judge:

I concur in the affirmance of the District Court's judgment, construed as provided in our judgment today, as in our judgment of December 10, 1971, so that the application of plaintiff Women Strike for Peace to erect a temporary display "adjacent to that occupied by the Christmas Pageant of Peace . . . in the general vicinity of the other displays" is satisfied by a location within the Ellipse area broadly defined, but not within the "central circular area" occupied by the Christmas Pageant of Peace.

The Government's park-use regulations, as they pertain to this case, are unconstitutionally discriminatory and overbroad. They are invalid insofar as they (a) wholly and at all times disable groups such as Women Strike for Peace (WSP) from erecting display structures while according that "privilege" to "NPS Events"—sponsored or co-sponsored by the National Park Service—such as the Christmas Pageant of Peace (CPP) and (b) otherwise contemplate blanket preemption of park land in favor of NPS Events in cases of simultaneous proposals for park-use by an NPS Event and a non-NPS Event. In the absence of regulations that are narrowly drawn and contain articulated criteria for distinguishing, on an objective basis, those who may and may not erect structures, that avoid the constitutional disability of determining park land use through censorship, WSP is entitled to court relief protecting its right to use park lands, and to include displays thereon, limited to avoidance of interference with the display erected annually by the Christmas Pageant for Peace.

It will be evident that my views coincide in large part with Judge Wright's. However, there is a difference between

---

94. *See* Findings of Fact, JA at 56–59.

95. *See id.* at 58–59.

96. *See* JA at 146.

97. *See* JA at 150–173.

us as to the appropriate decree. Moreover, his opinion paints First Amendment freedoms with a broader brush than I us?, some might say a freer stroke. His opinion reflects a reorientation of First Amendment analysis. This may be sound, but it requires additional thought that I think unnecessary for the case at hand. Thus, Judge Wright points out shortcomings in the concept of pure speech as distinguished from speech-plus-action. If that distinction is taken as a philosophical absolute, it is beset with shortcomings; if it is taken as shorthand, its imperfections may be no greater than those often encountered in the use of principled judicial doctrine for regulating the affairs of men. Structures on park land, even though temporary, are within the reach of freedom of communications, but they may have the kind of extra ingredient added to the message that goes beyond Tinker's armband or Stromberg's flag and permits appropriate government regulation.

## I.

The Park Service regulations challenged in A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (D. C.Cir.1971), were issued following the same administrative proceeding that led to the adoption of the regulations challenged here. The court of the prior litigation of this case and *Quaker Action* is adequately set forth in Judge Wright's opinion and I need not retrace it here.

In *Quaker Action* we remanded to the District Court for an evidentiary hearing into the reasonableness of numerical restrictions, put forward in the interests of Presidential safety, on the size of White House demonstrations. In the case at bar, there is no need for further proceedings. The content of Park Service policies has been clarified and embodied in its regulations.[1] The exposure shows they are unconstitutional.

In substance, the Park Service regulations come down to this: WSP's use of the Ellipse and other local park land under Park Service jurisdiction is curtailed as to permissible display, because it does not enjoy government sponsorship as an "NPS Event." That regulation falls squarely within the ambit of those cases that condemn, as an invalid prior restraint, an official regulatory scheme that empowers regulatory officials to pick and choose among those seeking to use public facilities for communicative activity, without providing narrowly drawn standards for the exercise of official discretion. The doctrine applies both to programs that operate through an informal practice, Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), and to formal licensing procedures, Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). A selection on the basis of unarticulated nonapparent criteria from among those applying for facilities for communicative activity amounts to a discriminatory denial to those not selected of constitutionally guaranteed rights of freedom of expression and of equal protection. Niemotko v. Maryland, supra, 340 U.S. at 272, 71 S.Ct. 325. They harbor the prospect of censorship.

The vitality of these decisions and the underlying principles is underscored by Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Noting the close intertwining of equal protection and First Amendment interests in these cases, the Court stated: "[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. * * * Selective exclusions from a public forum may not be based on content alone, and may not

---

1. In our first opinion in this case, Women Strike for Peace v. Hickel, 137 U.S.App. D.C. 29, 35, 420 F.2d 597, 603 (1969), we invited the Park Service
    to define and announce a set of coherent park policies, clarifying the mat-

ters that are as yet unclear, and perhaps modifying the policies on further reflection as to the interaction of the various interests properly taken into account.

be justified by reference to content alone." And to the extent that discrimination is necessary to further significant governmental interests, the discriminations made by the regulation must be narrowly tailored to serve a substantial governmental interest. The Court said:

> We have continually recognized that reasonable "time, place and manner" regulations of picketing may be necessary to further significant governmental interests. * * * Conflicting demands on the same place may compel the State to make choices among potential users and uses. And the State may have a legitimate interest in prohibiting some picketing to protect public order. But these justifications for selective exclusions from a public forum must be carefully scrutinized. Because picketing plainly involves expressive conduct within the protection of the First Amendment, . . . discriminations among picketers must be tailored to serve a substantial governmental interest. * * The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives. (408 U.S. at 98, 92 S.Ct. at 2291, citations omitted.)

The regulations before us [2] do not contain standards narrowly enough drawn, indeed they do not contain any standards at all. Nowhere in the regulations are there criteria for determining what groups are to receive "NPS" designation. The comments of the Secretary of the Interior proposing the regulations that were, in essence, adopted, suggest that "NPS" designation may very well be restricted in advance to certain enumerated events.[3] While this presentation noted

2. The Secretary of the Interior responded to our invitation, see note 1, *supra*, and issued a notice of proposed rulemaking, see 35 Fed.Reg. 11485, in which a number of regulations governing public gatherings in park areas were proposed. The proposed regulations were adopted substantially intact, see 35 Fed.Reg. 15393, et seq., so that 36 CFR now provides:

§ 50.19 Public gatherings.
  (a) Definitions:
  (1) The term "public gatherings" includes, but is not limited to, demonstrations, picketing, speechmaking, holding of vigils, parades, ceremonies, meetings, entertainment and all other forms of public assembly.

  .   .   .   .   .

  (4) The term "park areas" shall include all areas, including sidewalks adjacent thereto, other than the White House area, administered by National Capital Parks of the National Park Service.
  (5) The term "NPS event" means any celebration, commemorative, or recreational event sponsored or cosponsored by the National Park Service.
  (b) Public gatherings, other than NPS events, may be held only pursuant to a valid official permit issued in accordance with the provisions of this section. NPS events are excepted from the operation of this section. They will not require official permits; may be held in any park area or the White House area; and may preempt any such areas to the exclusion of other public gatherings.
  (c) Speaker's stands or platforms may be erected, where needed, as adjuncts to any permitted public gathering, except on the White House sidewalk; but no other structures (including billboards, displays, etc.) may be erected on park lands except in connection with NPS events. All such structures shall be erected as inconspicuously as possible, and with least possible damage to basic National Park System values, and shall be dismantled as soon as practicable after conclusion of the public gathering. I offer that it is material to our consideration at this stage of whether the regulations are truly the product of "reflective consideration," rather than administrative reflex, that they achieve precisely the same result—of totally excluding WSP's small display while permitting much larger CPP displays—that we were unable to sanction when the case was last before us.

3. *See* 35 Fed.Reg. 11490–91, 11492:
  As for park areas having natural settings, the National Park Service considers its prime responsibility to be to preserve them in as unspoiled a state as possible. In general, activities which tend to interfere with the public's enjoyment of their particularly appealing recreational-and-mental-health-restorative-values are not encouraged. Of course, the designation and mainte-

that the particular events listed were deemed in harmony with basic park purposes, this was both stated in a conclusory way and not carried over into any governmental requirement.

The regulation restricting display structures provides, see 36 CFR 50.19 (c):

(c) Speaker's stands or platforms may be erected where needed, as adjuncts to any permitted public gathering, except on the White House sidewalk; but no other structures (including billboards, displays, etc.) may be erected on park lands except in connection with NPS events. All such structures shall be erected as inconspicuously as possible, and with least possible damage to basic National Park System values, and shall be dismantled as soon as practicable after conclusion of the public gathering.

Looking at the Secretary's comments in support of the display structure restriction [4] and assuming, arguendo, that there is some support in the Secretary's

nance of adequate recreational areas within these national park sites are considered essential incidents of proper public enjoyment of the park values.

Additionally, many park sites under National Capital Parks administration also function as city recreational play areas. In the particular areas reserved for outdoor athletics, the playing of baseball, tennis, softball games, etc.

Moreover, there are other park activities directly related to fulfillment of National Capital Parks responsibilities in administering an urban park system for Washington, D.C. These include such activities as the annual Folk Festival staged by the Smithsonian Institution, the annual Art Show staged by the District of Columbia, and the Summer-in-the-Parks program conducted by National Capital Parks itself. The Mall functions as a park adjunct to the National Art Gallery, and the various Smithsonian Institution museums. The cultural, educational and recreational purposes to which those civic activities are dedicated are in harmony with the basic park values of the Mall.

Finally, there are national celebration, commemorative and recreational events that are sponsored (or cosponsored) by the National Park Service. These include the Christmas Pageant of Peace, the Cherry Blossom Festival, Independence Day (July 4th) Celebration, the President's Cup Regatta, and Inaugural Day events.

These and similar features of National Capital Parks administration are deemed to be essential incidents of promoting and maintaining proper public use of the National Capital Parks sites for the basic park value purposes to which they are primarily dedicated.

.     .     .     .     .

As for the erection of structures and bringing movable facilities on park lands: Proposed 36 CFR 50.19 permits speakers' stands and platforms to be erected, where needed, in connection with any permitted demonstration or other public assembly. These regulations also allow movable facilities—including stands, floats, chairs—to be used in connection with such activities. However, other structures will not be permitted to be erected in connection with permitted demonstrations or other public assemblies on National Capital Parks. An exception has been made, however, relative to structures incident to events determined by the National Park Service to warrant its sponsorship or cosponsorship.

4. *See* 35 Fed.Reg. 11492:

The Secretary is of the view that allowing structures to be erected on park land is generally undesirable, unless a supervening park purpose requires it since the erection of structures inevitably causes injuries to basic park values.

In the Secretary's judgment, barring the temporary erection of structures (other than speakers' stands or platforms) in connection with permitted assemblages on park lands has minimal impact on effectuation of the communication value of the first amendment freedoms. Proposed 36 CFR 50.19 makes adequate provision for movable facilities, signs, placards, etc., in connection with permitted demonstrations or assemblies on park lands. Going beyond the bar to the temporary erection of structures in connection with permitted assemblages on park lands, the Secretary is further of the view that freedom to communicate ideas does not extend to erecting structures on park lands advertising "messages" which some group or individual wishes to convey to the general public. The detriment to basic park values if billboard or display structure "messages" were permitted to be erected over the park

"park expertise" for his conclusion that structures on park land are generally undesirable ("inevitably causes injuries to basic park values"), there is no comparable support for his conclusion that structures other than speakers' stands and platforms have only minimal relation to the "communication value of the first amendment freedoms." Again, assuming support in park expertise for his conclusion that "messages" in display structures hinder enjoyment of parks ("cause great injury to the people's enjoyment of beautiful, unblemished, reposeful and uncluttered park areas"), the Secretary seems to have failed in full acceptance of the proposition that in a free society, park values as a whole are not properly in opposition to, but rather embrace, the values of freedom of communication. Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 32, 420 F. 2d 597, 600 (1969). And finally there can be no support in terms of his own limited concept of "basic park values," a concept apparently considered not to embrace communicative use of parks, for the distinctions he draws in terms of deciding when these basic park values are to be overborne by some higher good (because the event is NPS-sponsored), and when there is no offsetting good (because there is only a request for freedom to communicate in a cause that has not been decreed to merit NPS sponsorship). In the last analysis, all that is presented to us is an inchoate ipse dixit, without accompanying criteria, that NPS-sponsored events are deemed to have "supervening park purposes." More than this is necessary to justify the restrictive regulations. See *Quaker Action, supra,* 148 U.S.App.D.C. at 355, 460 F.2d at 863.

The legal vice of discrimination is accompanied by one of overbreadth, and resulting invalidity, insofar as the regulation provides for preemption of park

landscapes is obvious. It could result in offensive and unaesthetic defacement of park features and vistas, and cause

land in favor of NPS events, 36 CFR 50.19(b), without the requirement of a showing either that limited simultaneous use by another group would threaten interference with the NPS Event, or that such use would unduly compromise the Park Service's responsibility to maintain the parks as recreational facilities for the public at large as well as loci for communicative activity by individuals and groups.

## II.

Under the doctrine of United States v. Robel, 389 U.S. 258, 88 S.Ct. 419 (1967) and United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673 (1968), an incidental restriction on First Amendment activities may be justified

if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

United States v. O'Brien, *supra,* 391 U. S. at 377, 88 S.Ct. at 1679.

Judge Wright's opinion suggests that the conventional approach to such First Amendment cases, of differentiating protected "expression" from unprotected "action," should and indeed may be giving way to a new First Amendment theory, a more or less explicit interest-balancing theory in which communicative activities will be protected in inverse though indefinite proportion to the "societal costs" that stem from the activities. And Judge Wright goes on to conclude from his own examination that there is no nexus such as the Government alleges between the erection of the WSP display and substantial governmental interests (153 U.S.App.D.C. ——, 472 F.2d at 1289).

My own approach would be to say that I have no basis for rejecting the possibil-

great injury to the people's enjoyment of beautiful, unblemished, responseful and uncluttered park areas.

ity of a nexus between structures on park land and governmental interest in serenity of park use.

I understand Judge Wright to conclude that the Government's claim of nexus, that structures impair park values, is undercut by its permission for CPP structures. If I understand correctly what the Government officials have said, they recognize that even CPP structures impair park values. It is just that they think this impairment is offset by higher values. The overbreadth of the regulations that permits them to derive such offset is offensive, and unconstitutional, but it does not undercut the notion that structures impair park values.

The point is, however, that a regulation vidicating the nexus must be narrowly drawn, with articulated criteria. to avoid possibility of censorship. I certainly would not be disposed to envisage a ruling that condemned evenhanded regulations that permitted demonstration activity in parks generally, but barred them in a few park areas selected for primeval park purposes. I might further conclude that a regulation might validly prohibit all display structures, as imposing especially severe burdens on park values.[5]

Communicative activity on park land, though important, particularly so here at the seat of the Nation's government, *Quaker Action, supra,* 148 U.S.App.D.C. at 351, 460 F.2d at 859, is nonetheless only one of a number of interests that must be accommodated, in a proper system of park governance, social, cultural and recreational. But those problems are not before us. I mention them to highlight the limited nature of our action in this case.

### III.

This case requires consideration of the Government's fall-back position, that the display structure and preemption regulations are sustainable as applied in this case, that a simultaneous WSP display would have been unacceptable "interference" with the CPP displays. "Conflicting demands on the same place may compel the State to make choices among potential users and uses," Police Department of Chicago v. Mosley, *supra,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

It is the Government's premise (Br. 68) that the presence of the WSP display anywhere on the Ellipse would have introduced

> a jarring, strident, politically partisan factor into what has always been— since the inception of the Christmas Pageant of Peace in 1954—a nonpartisan and nonpolitical National Celebrational Event.

The Government's characterization of CPP as "nonpartisan and nonpolitical" does not stand up, as is demonstrated by Judge Wright's discussion, *supra* at 1291.

There is an "interference" question, apart from the partisan/nonpartisan issue, and this is given needed context by adverting to the actual dimensions of the Ellipse area. The total area involved is a rectangle, some three city blocks long and two city blocks wide. Its focal point (the "central circular area") is a large, generally elliptical area immediately south of the White House lawn. The sides and corners of the rectangle bound five smaller areas separated from the central circular area by access roadways. It appears that during the course of the CPP, its displays usually account for somewhat more than half of the area within the central circular area. Apparently no CPP displays are erected in the outlying areas.[6]

At our behest the District Court held an evidentiary hearing on the question of interference. Its relevant findings are as follows:

"10. There is physical space for the simultaneous inclusion of both plaintiff's

---

5. *See supra* note 4.

6. At the remand hearing, counsel for the Government indicated a willingness to stipulate that the WSP display could be "physically accommodated in a corner of the Ellipse," meaning outside the "circular Ellipse portion." J.A. I, 52.

display and the Christmas Pageant of Peace display on the Ellipse, both inside the central circular area and outside of that area.

"11. Plaintiff anticipates that most of those viewing its display will be persons already drawn to the Ellipse by the Christmas Pageant of Peace.

"12. Plaintiff anticipates a token number of its members (approximately 10) to be in attendance at the display at various times.

"13. Plaintiff's members do not propose to engage in any vocal or other related activity of persuasion at the display site but propose to simply stand by the display.

"14. There is ready access to the Ellipse from both the Constitution Avenue side and the E Street side. Visitors may enter the area from four directions and proceed to the display. Whether plaintiff's display be inside or outside the circular area of the Ellipse, its presence on the Ellipse during the 1971 Christmas season would not physically interfere with the visitor's access to the Ellipse for viewing of the Christmas Pageant of Peace.

"15. If plaintiff's display were placed adjacent to the Christmas Pageant display it would be perceived by most people as part of a unified theme of peace.

"16. Only those persons who are especially politically sensitive will view the plaintiff's proposed display other than as part of the general theme of peace. Such politically sensitive people will in all likelihood constitute only a small minority of all people who will visit the Ellipse during the Christmas season.

"17. If plaintiff's display were placed in the central circular area of the Ellipse in close proximity to the Christmas Pageant display the public coming to visit the Christmas Pageant of Peace might erroneously consider the plaintiff as a cosponsor for the entire Christmas program on the Ellipse or vice versa—thus creating confusion. If plaintiff's display were placed outside the central area the possibility of confusion would be minimal.

"18. Any confusion created by placing plaintiff's display in the central circular area of the Ellipse would not constitute a significant interference with the 1971 Christmas Pageant of Peace and if plaintiff's display were placed on the Ellipse outside the central circular area no interference would be created.

"19. Upon consideration of all of the evidence this Court finds that there would be no significant interference with the 1971 Christmas Pageant of Peace if permission were granted for plaintiff's proposal for a public gathering and structure on the Ellipse during the 1971 Christmas season.

---

The Government's fear was that the introduction of the WSP display of antiwar sentiment would have interfered with the enjoyment of the park area of those who came to see the Pageant of Peace. The pertinent findings of the District Court (17 and 18) may usefully be rearranged as follows: (a) If WSP's display were in the central circular area, where the Christmas Pageant of Peace is held, the public coming to visit that Pageant might be confused, and assume both displays were sponsored by the same group. However, any confusion so created "would not constitute a significant interference" with the Pageant. (b) If the display were placed inside the large Ellipse area, but outside the circular area, the possibility of confusion would be minimal, and no interference would be created.

The findings set forth in (b) above are clearly supported in the record, and support our judgment permitting WSP to maintain its display at the same time as the Christmas Pageant, but outside the circular area.

A more difficult question is presented by the claim that WSP should be permitted to present its display within the central circular area. That requires analysis of the findings summarized in (a). The District Judge recognized that an imme-

diately adjacent location for WSP would cause confusion and apparently recognized that any WSP location within the circular area might cause confusion, as to the separateness of the two displays. Finding No. 17. But relying on the testimony of WSP's psychologist-witness, he concluded that such confusion would not amount to significant interference with CPP displays. Finding No. 18.

Judge Wright's opinion builds on these findings as "not clearly erroneous." I am not prepared to accept these findings, on the record before us, as a basis for holding plaintiffs are constitutionally entitled to a display within the circular area containing the Christmas Pageant displays.

7. The witness testified, *inter alia*, J.A. 153–54:

[DIRECT EXAMINATION]

Q Well, according to the perception stages in psychology, will different people react differently to visual stimuli?

A Yes, one of the cardinal principles in perception is that different people will perceive according to various characteristics about themselves.

Q What kind of factors are at work in considering how a given person will perceive a given visual stimulus?

A Well first of all, of course, there are the characteristics of the stimulus itself, in the pattern of stimuli coming in to my eye, that I want to identify, because this is different than another pattern which I am going to identify— so there are the characteristics of what is out there, but then there are also certain structural characteristics or factors and our sensory mechanism organizes our perceptions for us. We don't perceive the discrete. This is the way perception fits in patterns, or in wholes.

A second set of influences in addition to the structural would be personal factors—that is our own needs, our wishes, our prior experience—these will influence what we see.

Finally we can identify social influences, that is the influence on what we will hear or see, depending on our social situation that we are in.

Q Could you just amplify for the Court's edification this structural determinant in its opposite equation. That is, if someone reacts in a physiological—in a structural way—could you give some laboratory example which

The only record support is the testimony of the psychologist-witness whose conclusion, that no interference would occur, is based on a theory of human perception mechanisms. In part this approach was derived from studies of how people of varying backgrounds and experience react to laboratory displays of groups of lines and dots.[7]

I do not think that constitutional issues, dependent on balancing of claims, can be conclusively resolved on the testimony of a single expert, even one holding special qualifications in that domain of psychology that deals with perception states and psycho-physical judgments.[8]

The application of the principles of psychology to specific problems requires

might make this clearer to the Court and for the record?

A Yes. For example, in listing some of the structural principles, first the list should be and would be that we tend to organize parts into a whole. For example, in the laboratory we might present certain patterns of dots and lines and when a person is asked to describe these he doesn't give you a straight description of those dots—or he would do the same thing with the lines. He organizes them into some kind of a pattern and says "Well—there are patterns or there are groupings".

.  .  .

Q Yes—similarly I take it, people would tend to identify something in context—for example in a certain laboratory example about series of numbers flashed—

A Yes, here we are getting over into the issue of one's prior experience or background. For example, if a person has been trained to anticipate a series of numbers during the course of an experiment, and is flashing a thing that looks like an incomplete "B", that is a "B" where the line to the top and bottom adjoining the straight lines are broken—a person who has been trained to expect numbers is going to say "thirteen" whereas if a person has been through some kind of experience with letters, he is going to say it is a "B", so that you get two different responses depending on the two persons.

Experience and background is what determines the responses there.

8. The witness's doctoral dissertation was on the subject, "Personality in Psychophysical Judgments."

knowledge and understanding of particular conditions, and the trier of fact must necessarily make some evaluation of the witness's judgment concerning those matters. The witness himself emphasized that in addition to the "structural" determinants of perception, there are "personal influences" of the spectators ("our own needs, our wishes, our prior experience") and social influences (dependent on their "social situation"). Yet the witness's conclusion that the WSP display of gravestones, put inside the circular area where the Christmas Pageant is presented, would be responded to "in terms of a total exhibit" was predicated almost entirely on the "structural factors which define how we organize our perceptions"—that "a part of something is integrated into the whole." He concluded that the structural factors "would operate to resolve any potential psychological conflict" between the WSP display and the Christmas Pageant; that due to the "massive stimuli" the essentially disparate elements would be organized and integrated in the "unity around the theme of peace;" that only for a "small minority" of politically "sensitized" visitors would there be a personal factor of perception that would discern a political overtone to the display (J.A. 162–65).

With all respect, this testimony must be taken as enhancing insight, not controlling outcome. Insofar as it brings forward relevant principles of perception, it is useful. It also makes a contribution in emphasizing a general structural tendency toward integration of stimuli. On the other hand, I find it disturbing that the witness did not specifically address himself to the issue of how the weight of the structural influence is affected when large out-of-doors stimuli are involved. This is a different point from that involved in his assertion that his research in tactile stimuli had application to visual stimuli, because "the same general principles of perception would hold in any modality" (J.A. 152). My point is that, in any modality, differences in scale may make for differences in kind. Even an untutored layman is aware that mico- and macro- applications are likely to present special problems. There is at least a question whether the organizing and integrating tendency may not be more powerful for line-and-dot configurations on a paper, than for displays so much more physically separated. The individual displays, to be described presently, are spread over an area that requires some walking from place to place—an area, of, say, 2–3 square blocks. There are some who drive by on the roadway, and gain an overall impression of lit-up trees without awareness of the content of the individual displays; presumably those passersby are not the audience in which WSP is interested. Since a person who comes to examine the displays on the Ellipse cannot view the displays together, at the same time, except at a distance, obviously there is at least a problem of perceptual integration, and I do not find this problem discussed by the witness.

What is more significant, the witness's testimony does not mention, much less grapple with, the dynamics of the situation. We are not considering stimuli presented with neutral emphasis, as in a laboratory. What is involved are persons who are coming to this area, often from a considerable distance, for the express purpose of inspecting the much-heralded Pageant. Then they would be presented, in addition, with what must at least be described as a different kind of exhibit. The Christmas Pageant of Peace includes these segments: a Nativity scene, the National Christmas tree, an array of smaller trees presented by states and foreign nations, a reindeer display, and stage and bandstand for various speaking and musical presentations. The WSP proposed display consisted of several gravestones.

It seems to me significant that there are emotional aspects to the displays of both CPP and WSP that distinguish the perception problems from those involved in relatively abstract line-dot drawings. Indeed, unless I completely misunderstand what this case is all about, it is the

very purpose of WSP to present a display that will be different enough from the Christmas Pageant to make the spectator stop and reflect.[9] To say that WSP's stark gravestones would be taken by most passers-by as part of a single continuum with the Christmas Pageant seems to me so unlikely that I would require stronger proof than this record contains to lead me to override what I think are the dictates of common sense.

Fortunately, the question of whether a location for WSP on the central circular area would have been likely to cause interference presents a harder question than this appeal requires be answered. WSP did not specifically demand a location at any particular point. It asked for

> an area on the Ellipse adjacent to that occupied by the Christmas Pageant of Peace. . . . in the general vicinity of the other displays of the Christmas Pageant for Peace in order to provide the Women Strike for Peace display with the same police protection accorded to the Christmas Pageant for Peace. It is not the intention of the Women Strike for Peace that their display interfere with any scheduled event of the Christmas Pageant for Peace.

App. 132.

While this may not be what WSP had in mind, I conclude that on a balancing of interests the appropriate result is to satisfy WSP's application by a location in the general Ellipse park area but outside the central circular area. From the exhibits and submissions before us, the conclusion of the District Court, that WSP would not threaten meaningful interference, is clearly supported in regard to a location for WSP on one of the outlying segments that is separated from the central circular area by access roadways.

This conclusion supports our affirmance of the District Court's order, construed as entitling plaintiff to a location within the Ellipse but not necessarily within the "central circular area."

On the record as it stands, I am not prepared to enjoin defendants, in implementing a policy of respecting plaintiff's rights, but without undue interference to CPP, from prohibiting a WSP location within the central circular area at the same time as the Pageant for Peace.

### IV.

At the end of the line we are left without a coherent framework of regulations, governing public gatherings in park areas subject to the jurisdiction of the National Park Service based on thorough and reflective consideration of park values, including First Amendment rights. The Department of the Interior has not shouldered the responsibility to provide discriminating, rather than discriminatory, park regulations. A forthcoming and careful exercise of administrative responsibility may serve to avoid administrative disarray.

Plaintiffs are, in my view, entitled to a continuing injunction restraining the enforcement of the regulations prohibiting structures on the Ellipse area, subject to the qualification that plaintiffs are not entitled to a display or structure that establishes interference, from the viewpoint of the large crowds brought to the area each Christmas by the Christmas Pageant for Peace, with their use and enjoyment of this Capital park area.

A passage in Judge Wright's opinion (p. 1292) suggests that the prohibition of such interference is proper if there is "a precise and fairly administered regu-

---

9. *See* the testimony as to purpose of the WSP display of Mrs. Edith Vilastrigo, for WSP, at remand hearing, J.A. 148:

> The object [of our display] is to be close to the White House where the decisions on the war are made, we would like the President to be aware of the fact that we have a tombstone honoring our American dead on the Ellipse, near to his house.
>
> The objective is clearly educational to let as many people know as possible that we are, that we have this—that we are opposed to the war in Viet Nam.

lation." That there must be fairness in administration is plain enough. Whether there must be a precise regulation on the subject of avoiding interference is another question. It would certainly be desirable, as avoiding any possible charge of indirect censorship. But I am not prepared to say that a regulation could not validly permit the Park Service officials to deny permits for any structures that would cause "interference" with the impact being communicated by structures already permitted.

In any event, this case has come to focus on the issue of whether or not there would be interference. I do not think the record as it stands requires rejection of an administrative determination that a WSP display within the circular area would constitute interference with CPP that would warrant denying a permit. However, in the absence of valid regulations, the defendants would stand enjoined from denying plaintiffs a permit on the mere ground that structures are prohibited for all activities other than NPS Events.

ROBB, Circuit Judge:

I concur in the result reached by Judge Leventhal that Women Strike for Peace may not place their imitation tombstones in the central circular area of the Ellipse but may put them at some nearby location.

I find nothing in the Constitution that gives Women Strike for Peace the right to intrude upon the Christmas Pageant with their display of propaganda. *See* Adderley v. Florida, 385 U.S. 39, 47–48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Certainly the Park Service should not be required to make the central circular area, occupied by the Christmas Pageant, a midway open to any ideological pitchman seeking a ready-made audience. On the other hand, since the Park Service permits the erection of structures on park land for the Christmas Pageant, I cannot say that Women Strike for Peace can be prohibited from placing an exhibit in a nearby area where it will not inter-fere with the Christmas Pageant. If structures on park land are allowed then permission must be granted with an even hand.