# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 14, 2016　　　Decided January 17, 2017

No. 16-5047

A.N.S.W.E.R. COALITION (ACT NOW TO STOP WAR AND END RACISM),
APPELLANT

GRAYLAN SCOTT HAGLER, PASTOR, PLYMOUTH CONGREGATIONAL CHURCH, ET AL.,
APPELLEES

v.

W. RALPH BASHAM, IN OFFICIAL CAPACITY AS DIRECTOR, U.S. SECRET SERVICE AND SALLY JEWELL, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00071)

*Mara Verheyden-Hilliard* argued the cause for appellant. With her on the briefs was *Carl L. Messineo*.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SRINIVASAN, MILLETT and PILLARD, *Circuit Judges*.

PILLARD, *Circuit Judge*: On the occasion of a U.S. Presidential Inauguration, thousands of people gather along the sidewalks, parks, and plazas that line the Inaugural Parade route. On January 20th, the parade travels the 1.2-mile, sixteen-block portion of Pennsylvania Avenue in Washington, D.C. that runs from the Capitol Building to the White House—a stretch sometimes referred to as America's Main Street. The Inaugural Parade tradition dates back to April 30, 1789, when George Washington was sworn in as the nation's first President. *See* Joint Congressional Committee on Inaugural Ceremonies, *Inaugural Parade*, J.A. at 1236. With a new government forming and the public eye focused on the event, demonstrators also turn out on Inauguration Day to voice their dreams and demands. One of the great accomplishments of our Constitution is its guarantee of the people's right to take to the streets to say what they think.

The National Park Service is responsible for managing the open-air, traditional-public-forum spaces along the Inaugural Parade route. A 2008 Park Service regulation authorizes a priority permit setting aside a fraction of those spaces for identified Presidential Inaugural Committee uses on Inauguration Day. The priority permit allocates thirteen per cent of the footage alongside the parade route for ticketed spectator bleachers constructed and administered by the Inaugural Committee. One of the designated bleacher areas is on Freedom Plaza. Plaintiff-Appellant ANSWER (Act Now to Stop War and End Racism) Coalition contends that authorizing Freedom Plaza bleachers in the priority permit violates ANSWER's First Amendment right to instead use the same space for a mass demonstration. Allocating that prime spot to ticketed bleachers, ANSWER asserts,

unconstitutionally prefers the government's message to its own.

The permit the Park Service regulation authorizes for the Inaugural Committee takes priority over any conflicting permit to demonstrate in the same space on Inauguration Day, but the ordinary permit system remains effective along most of the parade route. Seventy per cent of the footage immediately adjacent to the route remains available on a first-come, first-served basis to individuals and permitted groups. ANSWER does not challenge the Park Service's regulatory prerogative, consistent with the First Amendment, to exclude the public from some areas reserved for the Inaugural Committee, including areas exclusively for spectator bleachers. *See* Appellant Br. at 60. But ANSWER strongly prefers to demonstrate at Freedom Plaza because it is an open, elevated space that is easily visible from the Avenue and is historically associated with political protest. With its sightlines down the Avenue eastward toward the Capitol, Freedom Plaza is also, however, a salutary location for media staging and spectator seating. The Park Service thus included it within the fraction of the roadway-adjacent footage that the regulation assigns to the Inaugural Committee for such specified uses.

The Park Service regulation authorizing the priority permit, including the space on Freedom Plaza for the bleachers, is not a content- or viewpoint-based speech restriction, but a reasonable time, place, and manner regulation of the use of a public forum. It sets aside bleacher areas, including on Freedom Plaza, for the Inaugural Committee's use as part of the package the rule reserves to the Committee as event organizer. The First Amendment requires that any reasonable, content-neutral regulation limiting expression along the parade route leave ample space

available for peaceful demonstrations.  The First Amendment does not, however, support ANSWER's claim of a right to displace spectator bleachers with its own demonstration at Freedom Plaza.

## I.  Background

ANSWER, a group that "engages in political organizing and activism in opposition to war and racism," sought to engage in "expressive, free speech activities" on Freedom Plaza during the 2013 Presidential Inauguration.  Decl. of Brian Becker ¶ 5 (Nov. 13, 2013), J.A. at 435; Suppl. Pleading ¶ 1, *A.N.S.W.E.R. Coalition v. Jewell*, 153 F. Supp. 3d 395 (D.D.C. 2016) (No. 05-cv-71) (*2016 A.N.S.W.E.R.*).  As soon as the Park Service started accepting permit applications to demonstrate on Inauguration Day 2013, ANSWER filed an application to use Freedom Plaza and its adjacent sidewalks.  ANSWER's permit application sought permission to use the space for a multimedia demonstration, with "[s]igns, placards, banners, stage, sound, bleachers, art installation, props, canopies, and other facilitative materials."  Attach. 1 to Suppl. Pleading at 2, ANSWER Application for 2013 Inauguration, J.A. at 117.  The Park Service informed ANSWER that it would be permitted to use only a 160-foot long by 35-foot wide portion of Freedom Plaza for its Inauguration Day demonstration because, pursuant to a 2008 amendment to the Park Service's regulations governing areas of the National Park system in the National Capital Region, most of the Plaza was reserved for the priority use of the Inaugural Committee.

The 2008 amendment created a "regulatory priority use for limited, designated park areas for the P[residential] I[naugural] C[ommittee], the Armed Forces Inaugural Committee, and the Architect of the Capitol or the Joint

Congressional Committee on Inaugural Ceremonies." 73 Fed. Reg. 67,739, 67,740 (Nov. 17, 2008). Referring to Freedom Plaza by its Park Service designation as part of "Pennsylvania Avenue, National Historic Park," the regulation states:

> In connection with Presidential Inaugural Ceremonies the following areas are reserved for priority use as set forth in this paragraph. . . .
>
> (B) Portions of Pennsylvania Avenue, National Historic Park and Sherman Park . . . for the exclusive use of the Presidential Inaugural Committee on Inaugural Day for:
>
> > (1) Ticketed bleachers viewing and access areas, except that members of the public may use a ticketed bleacher seat that has not been claimed by the ticket holder 10 minutes before the Inaugural Parade is scheduled to pass the bleacher's block;
> >
> > (2) Portable toilets, except that they will be available to the public;
> >
> > (3) Television and radio media and Armed Forces Inaugural Committee parade support structures;
> >
> > (4) The area in front of the John A. Wilson Building for the District of Columbia reviewing stand;
> >
> > (5) Viewing areas designated for individuals with disabilities, except that they will be available to any disabled persons.

36 C.F.R. § 7.96(g)(4)(iii)(B) (2016). Maps separately identifying the areas allocated to each of the uses authorized

in subsections (1) through (5) accompany the regulation. *See id.* § 7.96(g)(4)(iii)(E).

The regulation leaves open to the public, including demonstrators, 70 per cent of the footage on Pennsylvania Avenue abutting the Inaugural Parade route. *Id.*; 73 Fed. Reg. at 67,741. Of the 30 per cent that is not open to the public, the regulation designates 13 per cent for Inaugural Committee bleachers. *See id.* The Inaugural Committee, which comes into being after the presidential election and is responsible for organizing, planning, and executing "most of the inaugural celebration activities," decides how tickets for bleacher seats will be distributed. *See* Audrey Celeste Crane-Hirsch, Congressional Research Service, *The Presidential Inauguration: Basic Facts and Information* at 5 (Jan. 9, 2013); 73 Fed. Reg. at 67,742.

In this appeal, ANSWER challenges the regulation's allocation of most of Freedom Plaza to the priority permit instead of to the public under the "generally applicable permitting regulations, governed by a 'first-come first-served' system of priority." Suppl. Pleading ¶ 14. ANSWER argues that the Park Service's promulgation and application of subsection (B)(1), the portion of the priority-permit regulation authorizing bleacher seating on Freedom Plaza, constitutes "identity-based, viewpoint-based and/or content-based discrimination," in violation of the First Amendment and the Equal Protection Clause. *Id.* ¶ 21; *see generally* Compl., *2016 A.N.S.W.E.R.*, 153 F. Supp. 3d 395 (No. 05-cv-71). ANSWER contends that the regulation authorizing spectator bleachers on the Plaza is an unconstitutional content-based restraint of dissent in favor of pro-government speech. Suppl. Pleading ¶ 22; Appellant Br. at 42.

This case presents a controversy likely to arise every four years. ANSWER has protested both Republican and Democratic inaugurations and has been granted a permit to demonstrate on a portion of Freedom Plaza for the imminent 2017 Inauguration. *See* Decl. of Brian Becker ¶ 9, J.A. at 436; ANSWER Coalition, *Permits Secured for Jan. 20 Mass Protest at the Inauguration!*, (Jan. 5, 2017), http://www.answercoalition.org/permits_secured_for_jan_20_ mass_protest_at_the_inauguration; National Park Service, National Mall First Amendment Permit Applications (Jan. 4, 2017), https://www.nps.gov/aboutus/foia/upload/NAMA_ InaugurationPermitRequests_01-04-17.pdf. ANSWER does not challenge the priority permit's allocation of space on any day other than Inauguration Day. ANSWER seeks a declaration that subsection (B)(1) is unconstitutional, and an injunction barring its enforcement.

The National Park Service, on behalf of itself and its parent agency the United States Department of the Interior, defends the challenged subsection on two alternative grounds. The Park Service's second defense, which we hold determinative here, is that the provision is a reasonable and content-neutral time, place, and manner regulation of a public forum. The priority permit, the Park Service asserts, is narrowly tailored to the government's significant interest in conducting a public Inaugural ceremony. *See* Gov't Br. at 39-40. The Park Service also argues that any speech that occurs in the Inaugural Committee's bleachers would be government speech not subject to the First Amendment's restrictions. Because we conclude that the challenged regulatory subsection is a content-neutral time, place, and manner restriction, we do not reach the government speech question.

## A. Earlier Cases Challenging Park Service Regulations in the Nation's Capital

Political protestors and the Park Service have been here before. In *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), we enjoined a Park Service permit to President William Jefferson Clinton's 1997 Inaugural that displaced all demonstrator permits along the entire Inaugural Parade route, and that did so not only during the parade, but for several months leading up to Inauguration Day. The Park Service in that case lacked the regulatory support it invokes today. It instead sought to preempt first-in-time permitted demonstrators by issuing itself a "blocking permit" for the "entire length of Pennsylvania Avenue sidewalks for a five-month period." *Id*. at 1458-59. The Service then compounded the constitutional flaw of that sweeping prohibition by stating that it would not in practice exclude all demonstrations from the sidewalks, but only those whose message was "inconsistent" with the government's intended use. *See id*. at 1457-59.

We held in *Mahoney* that the Park Service's viewpoint-based exclusion of disfavored demonstrators violated the First Amendment. We took pains to dispel any suggestion that the "government can never control the use of segments of its own property against actual inconsistent usage by persons attempting First Amendment expression." *Id*. at 1458. The constitutional violation there was the government's attempt to "suppress opposing viewpoints" by excluding only disfavored demonstrators, and by taking the space out of general public use for several months. *Id*. at 1456. We held that the government may not "by fiat take a public forum out of the protection of the First Amendment" and purport to completely exclude all demonstrators as a ruse to exclude only those "citizens whose views it fears or dislikes." *Id*. at 1457, 1459.

The Park Service's regulatory authority has not always been as constrained as it is today.  In *A Quaker Action Grp. v. Morton*, 516 F.2d 717 (D.C. Cir. 1975) (*Quaker Action IV*) and *Women Strike for Peace v. Morton*, 472 F.2d 1273 (D.C. Cir. 1972), for example, this Court reviewed challenges to a Park Service regulation that required a permit for any public gathering in National Park areas, but "excepted" events sponsored or co-sponsored by the Park Service ("NPS events") and provided that events to which the Service chose to lend its sponsorship "may preempt any such areas to the exclusion of other public gatherings."  *Quaker Action IV,* 516 F.2d at 737 (App.) (citing 36 C.F.R. §§ 50.19(a)(5), (b)).  The regulation contained no "expressed standards for selection of 'NPS events.'"  *Quaker Action IV*, 516 F.2d at 728.  We noted that because such unconstrained discretion in the administration of a public permitting regulation invited discriminatory enforcement, it was "patently inconsistent with the Constitution."  *Women Strike for Peace*, 472 F.2d at 1290 (opinion of Wright, J.); *Quaker Action IV*, 516 F.2d at 728.

In response to that litigation, the Park Service promulgated a regulation establishing National Celebration Events that "occur at the same time and location" every year, 46 Fed. Reg. 55,959, 55,960 (Nov. 13, 1981)—or in the case of Inauguration Day, quadrenially, 45 Fed. Reg. 84,997, 84,997 (Dec. 24, 1980).  The events continued to receive priority use of designated areas, but the Park Service's discretion was constrained by the limitation of space afforded and the specification of the events in the Federal Register.  46 Fed. Reg. at 55,960.

### B. ANSWER's Initial Complaint, Preceding the Challenged 2008 Regulation

ANSWER initiated this case in 2005, after President George W. Bush's second Inauguration, when it filed a complaint challenging the National Park Service's since-further-amended regulatory approach. Since 1980, the Park Service's regulations have designated the White House sidewalk and portions of Lafayette Park for the "exclusive use of the Inaugural Committee on Inauguration Day." 36 C.F.R. § 7.96(g)(4)(iii)(A); 45 Fed. Reg. at 84,997-98. When ANSWER brought this case in 2005, all other areas immediately adjacent to the Inaugural Parade route, including Freedom Plaza, were open to the public for use by individuals or groups who obtain Park Service special-event or demonstration permits on a first-come, first-served basis. *See* 36 C.F.R. § 7.96(g)(4)(i) (2004). The Inaugural Committee did not then have a regulatory priority permit to use Freedom Plaza. Instead, on an *ad hoc* basis before the one-year permit application period opened, the Park Service granted a permit to the second Bush Inaugural Committee for "the entire length of the Pennsylvania Avenue sidewalks (plus additional areas)." *See A.N.S.W.E.R. Coalition v. Kempthorne*, 537 F. Supp. 2d 183, 187 (D.D.C. 2008) (*2008 A.N.S.W.E.R.*).

ANSWER's initial complaint included three counts. It challenged: the Park Service's *ad hoc* deviation from the Service's general permitting regulation in favor of the Inaugural Committee (Count I); the ban on sign supports (rods or sticks on which handheld signs could be held aloft) (Count II); and the *ad hoc* permit's broad exclusion of protestors from vast portions of Pennsylvania Avenue (Count III). *See 2016 A.N.S.W.E.R.*, 153 F. Supp. 3d at 402. The parties cross-moved for partial summary judgment on Count I, and the district court ruled in ANSWER's favor that the

Park Service unconstitutionally failed to follow its own generally applicable permitting regulations. *See 2008 A.N.S.W.E.R.*, 537 F. Supp. 2d at 206. The court reasoned that the Park Service's departure from the regulations' procedural requirements in order to give special treatment to the Inaugural Committee worked "an abridgement of communication" against other permit seekers. *Id*. at 199 (quoting *Quaker Action IV*, 516 F.2d at 727). The Park Service did not appeal that adverse decision, but responded by promulgating the 2008 amended regulation, including the priority permitting provision for bleachers at Freedom Plaza now before us.

### C. ANSWER's Supplemental Pleading Adding its Claim Against the 2008 Rule's Grant of Bleacher Space to the Inaugural Committee

On December 7, 2011, ANSWER applied for a permit to demonstrate on Freedom Plaza and its adjacent sidewalks during the 2013 Inauguration. The Park Service then filed an application that invoked the priority permit regulation on behalf of the Inaugural Committee. In accordance with the 2008 regulation, the priority permit included "designated portions of Freedom Plaza" specifically for "bleachers for viewing during the Inaugural Parade." Letter from Robbin Owen, Division of Permits Management, to Brian Becker, ANSWER Coalition National Coordinator (Jan. 4, 2012), J.A. at 687; Inaugural Committee Permit Application for 2013 Inauguration at 4, J.A. at 598. As set forth above, the Park Service's regulatory priority displaced ANSWER's first-in-time-application for all but a fraction of Freedom Plaza 160 feet deep, with 35 feet abutting Pennsylvania Avenue. ANSWER then supplemented its complaint to add Count IV challenging subsection (B)(1) of the regulation as "identity-

based, viewpoint-based and/or content-based discrimination in violation of the First Amendment." Suppl. Pleading ¶ 21.

The Park Service informed ANSWER that after the Presidential election and formation of the Inaugural Committee, some eleven months in the future, ANSWER might discuss with that Committee whether it would be willing to accommodate ANSWER's planned protest on its regulatory priority portion of Freedom Plaza. ANSWER also could apply to demonstrate at other locations abutting the route, including John Marshall Park, another park area on Pennsylvania Avenue. *See* 36 C.F.R. § 7.96(g)(4)(iii)(E) (Maps 1-2).

Once the election was over and the new Inaugural Committee was formed, ANSWER diligently sought to coordinate with the Committee regarding the possibility of using more space on Freedom Plaza. After meeting with ANSWER, the Inaugural Committee told ANSWER that it intended to use its entire allocated space on Freedom Plaza. Having failed to persuade the Committee to cede its bleacher space at Freedom Plaza, ANSWER would have to resort to space elsewhere along the parade route.

Several months after the 2013 Inauguration, the parties cross-moved for summary judgment as to Counts II, III and IV. The district court granted judgment to the Park Service. *2016 A.N.S.W.E.R.*, 153 F. Supp. 3d at 400-01. On Count II, the court held that the ban on sign supports was narrowly tailored to ensuring safety and managing pedestrian traffic at the Inauguration, *id*. at 417, a decision ANSWER did not appeal. On Counts III and IV, the court conducted a two-step analysis. It first assumed that bleachers were authorized as an expressive activity or venue for expression, and decided that—like the parades and orations elsewhere in the priority-

permitted Inauguration areas—bleacher speech constitutes government speech not subject to First Amendment scrutiny for content or viewpoint. *Id*. at 410-13.

The district court acknowledged that, although the government may express its own viewpoint in a public forum, any regulatory restriction on private expression in the forum remains subject to constitutional scrutiny. *Id*. at 413-14 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015)). The court therefore next analyzed the regulation's effect on demonstrators under intermediate scrutiny, holding it narrowly tailored to the government's significant interest in planning and executing the Inaugural Ceremony and Parade. *Id*. at 415. The court determined that the regulation's incidental restrictions on speech are no greater than necessary to serve the government's significant interest and that it leaves sufficient alternative channels for communication, as it designates only a modest portion of the Inaugural Parade route for the Inaugural Committee's use. *Id*. at 415.

## II. Analysis

ANSWER appeals the district court's grant of summary judgment on Counts III and IV in the Park Service's favor, pressing its challenge to the Park Service's regulation both on its face and as applied in the 2013 Inauguration permitting cycle to give the Inaugural Committee's permit priority at Freedom Plaza. We review the district court's grant of summary judgment *de novo*. *See Hodge v. Talkin*, 799 F.3d 1145, 1155 (D.C. Cir. 2015).

The regulation designates areas of priority use along the Pennsylvania Avenue sidewalk. That space, including Freedom Plaza, is a quintessential public forum. *See*

*Mahoney*, 105 F.3d at 1457. Its importance to public dialogue is acute on Inauguration Day. *See id*. at 1458.

The constitutionality of regulation of public forums depends first on whether the regulation is content based. Content-based regulations are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Second, because traditional public forums are vital places for speech, even a content-neutral public-forum regulation is subjected to additional First Amendment scrutiny to determine whether it is a reasonable time, place, and manner restriction "narrowly tailored to serve a significant governmental interest" that "leave[s] open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

### A. The Regulation Is Not A Content-Based Speech Restriction Subject to Strict First Amendment Scrutiny

**1. The Regulation is Facially Content Neutral.** To be subject to evaluation under the more lenient, "intermediate" scrutiny applicable to time, place, and manner regulations, a rule must not itself be content based, *see Reed*, 135 S. Ct. at 2228, and must be "justified without reference to the content of the regulated speech," *Ward*, 491 U.S. at 791. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. Facial distinctions based on message, whether they regulate the speech's subject matter, function, or purpose, are content

based and so subject to strict scrutiny. *Id*. Meanwhile, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994).

The challenged regulation is content neutral on its face. It authorizes the Inaugural Committee to construct and administer "[t]icketed bleachers viewing and access areas," along with space for disabled spectators, media, toilets, and the District of Columbia's reviewing stand. 36 C.F.R. § 7.96(g)(4)(iii)(B)(1); *see id*. §§ 7.96(g)(4)(iii)(B)(2)-(5). Contrary to the district court's background assumption, the regulatory priority granted to the Inaugural Committee by subsection (B)(1) to provide spectator bleachers turns not on the content of any speech, but on the desirability of providing to the Inaugural Committee as the event organizer a limited amount of reserved seating for ticketed spectators.

Subsection (B)(1)'s provision for bleachers at Freedom Plaza is "not a 'regulation of speech,'" but a "regulation of the places where some speech may occur." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). The Colorado statute in *Hill* made it unlawful to knowingly approach within eight feet of another person, without consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person" within 100 feet of the entrance to any health care facility. *Id*. at 707. The Court held the Colorado law was not viewpoint based, but that it imposed a reasonable time, place, and manner restriction on knowingly approaching, for specified purposes, patients entering the clinics. *Id*. at 725-26. There was no evidence in *Hill* that Colorado enacted its law "because of disagreement with" the message of the regulated speech: The regulation applied "equally to all demonstrators, regardless of

viewpoint, and the statutory language ma[de] no reference to the content of the speech." *Id*. at 719.

The regulation at issue here is even more clearly content neutral, because it makes no reference at all to speech, let alone the content of speech. It simply provides for permitting of spectator bleachers and a cluster of non-speech functions on Freedom Plaza in service of the Inaugural celebration, and it only indirectly regulates where demonstrations may occur by displacing them from that spot. Any displaced speakers' content is irrelevant: Nothing in the regulation would prohibit a ticketholder to the Inaugural Committee's bleacher area from publicly endorsing ANSWER's message. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (regulation excluding people from a 35-foot buffer zone outside clinics where abortions are performed did not "draw content-based distinctions on its face"). The record contains no evidence that the Park Service would have pared back the scope of the priority permit at Freedom Plaza if demonstrators with a message more to the government's liking had asked. *Cf. Mahoney*, 105 F.3d at 1455-56; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *Niemotko v. Maryland*, 340 U.S. 268, 272-73 (1951). And the regulation provides a rule under which non-ticketholders may occupy bleacher seats if they remain unclaimed ten minutes before the Inaugural Parade is scheduled to pass. 36 C.F.R. § 7.96(g)(4)(iii)(B)(1). Inaugural Committees are entitled to the priority permit, on behalf of any President-elect, no matter the views of the Committee or President-elect. The regulation also equally excludes anyone who might elbow into the reserved area, regardless of whether she or he wishes to protest, show support, or simply get a better view. Here, the regulatory preference for "[t]icketed bleachers viewing and access areas" draws no content distinction.

**2. The Regulation is Justified Without Reference to the Content of Speech.** The facially neutral regulation is also "justified without reference to the content" of any potential speaker's alternative use of the Plaza space and was not adopted "because of disagreement with the message" of any anticipated expression on Inauguration Day. *See Reed*, 135 S. Ct. at 2227; *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968). The inquiry into regulatory purpose ensures that a facially neutral regulation affecting speech is not designed to suppress content the government disfavors. By its nature, a restriction on use of a public forum is bound to curtail some speech. But a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

The function of the challenged provision, subsection (B)(1), is to provide "viewing and access areas." 36 C.F.R. § 7.96(g)(4)(iii)(B)(1). The governmental purpose is unrelated to the content of expression. There is no evidence in the record that the regulation was adopted because of any disagreement with ANSWER's—or any demonstrators'—message, nor any evidence of desire generally to suppress dissent or otherwise discriminate with regard to content. The regulation is therefore content neutral. *See Reed*, 135 S. Ct. at 2227; *see also O'Brien*, 391 U.S. at 377.

ANSWER argues that the regulation is content based because it restricts ANSWER demonstrating at Freedom Plaza while favoring the incoming administration's supporters. *See* Appellant Br. at 6, 42. ANSWER's admittedly viewpoint-based reason for seeking access to the Plaza does not, however, make any rule that stands in its way content based. The regulation excludes ANSWER from portions of Freedom Plaza not because it seeks to

demonstrate, nor due to the content of the message ANSWER wishes to communicate, but to ensure some premium space for "[t]icketed bleachers viewing and access areas" as part of the event package reserved for the Inaugural Committee. 36 C.F.R. § 7.96(g)(4)(iii)(B)(1). The Park Service's provision for the Inaugural Committee to construct its bleachers, even as 70 per cent of the Inaugural route remains available for demonstration permits, is no more content based than the unchallenged provisions reserving areas for portable toilets, media stands, or viewing areas for individuals with disabilities. *See id*. §§ 7.96(g)(4)(iii)(B)(2), (3), (5).

We see no record evidence suggesting that the government intended the bleacher area to be a conduit for communicating any content to the public, that the government controls the content of spectator expression in the bleachers, or that the public will perceive the government to be speaking via the bleachers. *See* Appellant Br. at 36. *But see 2016 A.N.S.W.E.R.*, 153 F. Supp. 3d at 412-13 (concluding otherwise). The regulation makes no suggestion that the purpose of the Freedom Plaza bleacher seating is communicative. The bleachers are for ticketed spectators to view the parade. The Final Rule's only reference to control of the bleachers' use is that "[t]raditionally, each P[residential] I[naugural] C[ommittee] decides how, and to whom, to distribute P[residential] I[naugural] C[ommittee] bleacher seat tickets." 73 Fed. Reg. at 67,742.

ANSWER's contrary characterization is unpersuasive. It casts subsection (B)(1) as an impermissible content-based effort to provide supporters of the administration an enhanced "visible presence" on Inauguration Day to the exclusion of ANSWER, an avowed government critic. *See* Appellant Br. at 42-43. ANSWER quotes the Park Service's counsel in the district court contending that the Inaugural Committee "wants

to be able to provide a presence" for ticketholders along the Pennsylvania Avenue sidewalks. Appellant Br. at 42 (quoting Tr. of Mot. Hr'g at 10). ANSWER takes that comment out of context. The Service there acknowledged that the sidewalk adjoining the Inaugural Parade route is valuable both for expression by demonstrating parties seeking a "visible presence" (such as ANSWER), and for those wishing to reserve choice viewing areas (such as the Park Service on the Committee's behalf). ANSWER's desire to demonstrate at Freedom Plaza—an undeniably expressive use—does not render the Park Service's intended use expressive. *Cf. O'Brien*, 391 U.S. at 376.

The regulation itself is agnostic as to whether the persons to be seated will even be supporters of, or chosen by, the incoming president, let alone whether they will express themselves in any particular way. Consistent with the rule, President Obama's 2009 Inaugural Committee, for example, offered some of its bleacher seats at a nominal price to any member of the public. *See Gone in 60 Seconds*, Politico (Jan. 10, 2009), http://www.politico.com/story/2009/01/gone-in-60-seconds-inaugural-parade-tickets-017310 (noting publicly available Inaugural Committee tickets for 2009 Inauguration sold out in under one minute). And the rule itself contains a 10-minute release provision that allows any member of the public to occupy a ticketed seat for free if the ticketholder has not claimed it ten minutes before the parade passes. 36 C.F.R. § 7.96(g)(4)(iii)(B)(1); 73 Fed. Reg. at 67,741. The set-aside of viewing areas on Freedom Plaza "open to members of the public who have disabilities" also reflects the rule's premise that spectators are present to watch, rather than to engage in some kind of loyalty performance. 73 Fed. Reg. at 67,741; *see also* 36 C.F.R. § 7.96(g)(4)(iii)(B)(5); *id.* § 7.96(g)(4)(iii)(E) (Map 8). The decision by the Park Service to grant the Inaugural Committee space to provide

viewing areas was neither expressly nor implicitly conditioned on the ticketholders communicating anything on Inauguration Day. The mere possibility that a priority permit might be susceptible of such use does not make it a content-based regulation of speech. *Cf. Turner*, 512 U.S. at 652 ("Appellants' ability to hypothesize a content-based purpose for [the law at issue] rests on little more than speculation and does not cast doubt upon the content-neutral character of [the law].").

Content-neutral regulatory line-drawing may incidentally burden speech without running afoul of the First Amendment. *See Ward*, 491 U.S. at 791; *Turner*, 512 U.S. at 643. In *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), for instance, the Supreme Court upheld statutory authorization for veterans' organizations to use tax exempt contributions for lobbying purposes while other nonprofits lacked authority to do the same. The line drawn between veterans' groups and other nonprofits reflected the country's "long standing policy of compensating veterans for their past contributions." *Id.* at 551. The Park Service's priority permit for the Inaugural Committee planning a "national celebration event" reflects a similarly well-established policy of enabling a public ceremony to recognize the start of a new presidential administration. *See* 36 C.F.R. § 7.96(g)(1)(iii). The Park Service's regulation, including subsection (B)(1) authorizing bleachers at Freedom Plaza, is no more content based than the line drawn between veterans' groups and other nonprofits that the Court upheld in *Regan*, or the restrictions on leafletting and handbilling sustained in *Hill*.

Finally, this case is easily distinguished from the content-based enforcement scheme that we invalidated in *Mahoney*. The Christian Defense Coalition sought permission in 1997

for its members "to stand on the sidewalk and peacefully note their dissent" as the Inaugural Parade passed, but were told that its members would be subject to arrest if they picketed at any point alongside Pennsylvania Avenue. 105 F.3d at 1455-56. The Park Service in *Mahoney* issued to itself a permit for the entirety of Pennsylvania Avenue for several months, thus displacing all permits to demonstrate anywhere along the Inaugural Parade route. 105 F.3d at 1457-58. The government's putative, content-neutral justification was to prevent demonstrators' "physical intrusion" into the Inaugural event. *Id*. at 1458. But the government's proffered justification was revealed to be pretextual when the Park Service "conceded that if appellants were carrying no signs or, indeed, if they were carrying signs favorable to the administration whose second Inaugural was being celebrated, their 'physical intrusion' would be welcomed." *Id*. Here, there is no hint of any such content-based purpose by the Park Service to pick and choose among demonstrators based on their messages.

ANSWER contends that the Obama Inaugural Committee in 2012 conducted a "political vetting" to decide whether to invite ANSWER to share some of the Plaza space included in the Committee's permit, and that the Committee unconstitutionally concluded "on the basis of viewpoint that ANSWER had 'competing interests' for expression along the parade route." Appellant Br. at 62. The First Amendment presumptively bans political vetting as a condition of access to a public forum, but the fleeting assertion in ANSWER's brief that a past Inaugural Committee engaged in "vetting" fails for several overlapping reasons to raise an issue of fact material to the claim ANSWER pleaded and litigated here. First, the "vetting" contention is vague and conclusory, resting on a single statement that unidentified members of the Inaugural Committee asked unidentified ANSWER

representatives "about our goals, messaging, and how we do outreach and organize." Decl. of Brian Becker ¶ 33, J.A. at 443. Second, it is unclear how the "vetting" contention relates to this case as ANSWER has framed it. The Inaugural Committee, the putative vetter, is not a defendant; the vetting of which ANSWER complains does not help to show the asserted constitutional defect in the regulatory subsection (B)(1) that ANSWER challenges; and ANSWER has no evidence that vetting is likely to recur such that it could be redressable by the declaratory and injunctive relief ANSWER seeks.

We conclude that the regulation is content neutral and is justified without reference to the content of regulated speech. Having determined that the regulation is facially content neutral and justified without reference to the content of expression, we have no occasion to rely on any notion that the regulations involve government speech of the kind described in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), and *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015). The public forum analysis suffices.

### B. The Priority Permit for the Inaugural Committee Is a Reasonable Time, Place, and Manner Restriction

Because the regulation is content neutral, any incidental effect it has on speech is subject to the intermediate scrutiny that governs time, place, and manner restrictions. *Ward*, 491 U.S. at 791. To survive such scrutiny, the regulation must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Id.*; *Henderson v. Lujan*, 964 F.2d 1179, 1183 (D.C. Cir. 1992).

**1. The Regulation Serves a Significant Governmental Interest.** The regulation is directed to the government's significant interest in facilitating the President-elect's public Inaugural ceremony. *See* Gov't Br. at 39-40. The date of the Presidential transition is mandated by the Constitution, *see* U.S. Const. amend XX, § 1, and its attendant celebration is contemplated in federal legislation, *see* Presidential Inaugural Ceremonies Act, Pub. L. No. 84-986, 70 Stat. 1049, 1049 § 1 (1956), codified at 36 U.S.C. § 501(2). For its part, ANSWER does not contest the Inauguration's importance as a national celebration. *See* Appellant Br. at 48 ("The public Inaugural Parade is deeply rooted in the American tradition . . . ."); 73 Fed. Reg. at 67,739. Nor does it argue that the governmental interest in giving a committee control over some public space to organize an open-air, public Inaugural ceremony is insignificant. Rather, ANSWER argues that the government cannot show that the regulation is narrowly tailored to serve that interest. *See* Appellant Br. at 47.

The reason the Park Service created a priority permit regulation is to facilitate a public "Inauguration celebration for a newly elected President." Gov't Br. at 39; 73 Fed. Reg. at 67,739 (describing Inauguration as "a national celebration event for the benefit of all citizens"); 36 C.F.R. §§ 7.96(g)(1)(iii), (4)(ii) (designating Inauguration as National Celebration Event). To achieve that goal, the regulation creates a "regulatory priority use for limited, designated park areas for the P[residential] I[naugural] C[ommittee], the Armed Forces Inaugural Committee, and the Architect of the Capitol or the Joint Congressional Committee on Inaugural Ceremonies, entities whose role in the Inaugural has traditionally necessitated such use." 73 Fed. Reg. at 67,740. That regulatory priority makes sense. Congress put the Inaugural Committee "in charge of the Presidential

inaugural ceremony and functions and activities connected with the ceremony." 70 Stat. at 1049 § 1, codified at 36 U.S.C. § 501(1). To support that role, the Act allows the Secretary of the Interior to "grant to the Inaugural Committee a permit to use [federal land] during the inaugural period." *Id*. § 503.

The Park Service's designation of space for reserved seating is a reasonable component of a priority permit for a public Inaugural celebration. Part of organizing the Inauguration is providing seating for spectators; the Inaugural Committee's regulatory priority allows just that. *See* 36 C.F.R. § 7.96(g)(4)(iii)(B)(1); *see also* Inaugural Committee Permit Application for 2013 Inauguration at 4, J.A. at 598 ("For all proposed bleacher space, we will be placing bleachers for viewing during the Inaugural Parade on January 21st."). The Park Service also asserts a more particular interest in facilitating the Inaugural Committee's fundraising efforts by allowing it to sell bleacher tickets, *see* Gov't Br. at 40-41, but we neither find record support for such an interest nor do we believe it material to the validity of the Park Service rule under the First Amendment.

**2. The Regulation is Narrowly Tailored to the Governmental Interest.** In order to satisfy the requirement that the regulation be narrowly tailored to the government's significant interest, the government must show "a close fit between ends and means." *McCullen*, 134 S. Ct. at 2534. We must satisfy ourselves that the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. The regulation "need not be the least restrictive or least intrusive means of serving the government's interests," but it "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen*,

134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799); *see also Ward*, 491 U.S. at 797 ("[R]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (declining under a time, place, and manner analysis to "judge how much protection of park lands is wise and how that level of conservation is to be attained").

The government has cleared this hurdle. The Park Service's regulation sets aside 13 per cent of the parade route along Pennsylvania Avenue for Inaugural Committee bleachers, including the bleachers on Freedom Plaza. It leaves open 70 per cent of the route for the public. The total of the ticketed bleacher area under the current rule is substantially reduced from the amount of space the bleachers have occupied in the past. *See* 73 Fed. Reg. at 67,741 (noting current regulation reduces bleacher area to 24 bleachers from 49 bleachers in 2005); *id.* ("[T]he final rule substantially increases the park areas available to the public and demonstrators."); *cf. Mahoney*, 105 F.3d at 1458-59 (doubting that Park Service permit blocking demonstrators from entire parade route for five-month period satisfies narrow tailoring). No doubt there are significantly more spectators who wish to attend the Inauguration than these bleachers can accommodate. The reservation of limited space along the parade route for bleachers as part of the event package afforded to the Inaugural Committee allows the Committee to offer a moderate number of seats to ticketed spectators, while also leaving most "front row" space along Pennsylvania Avenue available to others, including demonstrators.

We are also satisfied that the governmental interest would be "achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. ANSWER contends that the Constitution requires that ticketed bleacher space be limited to what the Inaugural Committee might be able to obtain in a first-come, first-served public permit application process. Suppl. Pleading ¶¶ 14-15, 17; Appellant Br. at 48, 58; Appellant Reply Br. at 30. That process, however, opens eleven months before the election of the incoming president has even occurred, when no Inaugural planning committee exists to submit such an application. This regulation is a practical and reasonable response to that problem.

ANSWER's arguments to the contrary are unavailing. First, ANSWER argues that the government has not met its burden because it fails to show that Inaugural ceremonies would be cancelled absent the regulation. *See* Appellant Br. at 48-49. ANSWER also argues that the regulation is not narrowly tailored because in 2009, pursuant to a settlement with the Park Service, ANSWER was able to use part of the area on Freedom Plaza that the regulation allocates to the Inaugural Committee's bleachers and the Inaugural ceremony still happened. Appellant Br. at 49. Otherwise valid restrictions arising from conflicting uses need not be struck down, however, "merely because the government has for a time stayed its hand." *Henderson*, 964 F.2d at 1183. The narrow tailoring requirement is not a "least intrusive" or "least restrictive" means test. *Ward*, 491 U.S. at 798.

Next, ANSWER argues that Freedom Plaza has unique symbolic and historic characteristics that merit special analysis. *See* Appellant Br. at 4, 40-41. There may well be circumstances in which the Plaza's admittedly salutary aspects and symbolic value could be relevant to a time, place, and manner analysis. But ANSWER cites no case in which

the quality of particular public-forum space means that the First Amendment places it out of reach of any exclusive event permit. Two reasons support the contrary conclusion. For one, ANSWER is not necessarily entitled to its favored place for expression. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981). For instance, in *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984), we upheld a prohibition against protestors standing still with signs in the center portion of the White House sidewalk, despite the plaintiff's contention that the center portion is "particularly evocative . . . for symbolic protest." *Id*. at 1534-38.

A second flaw is ANSWER's failure to distinguish the Freedom Plaza bleachers from other historically significant areas, including the White House sidewalk and Lafayette Park. *See* 36 C.F.R. § 7.96(g)(4)(iii)(A). Those areas are similarly "controlled by the Inaugural Committee through a reserved ticket system." 73 Fed. Reg. at 67,741. And those areas have historic and symbolic importance. *See Quaker Action IV*, 516 F.2d at 725 ("[T]he White House sidewalk, Lafayette Park, and the Ellipse constitute a unique situs for the exercise of First Amendment rights."); *Women Strike for Peace*, 472 F.2d at 1287 (opinion of Wright, J.) ("There is an unmistakable symbolic significance in demonstrating close to the White House or on the Capitol grounds . . . ."). Aside from alluding to "unique ceremonial and security issues" associated with the Presidential reviewing stands, ANSWER does not provide a principle for drawing a constitutional line between ticketed access to Lafayette Square and ticketed access to bleachers at Freedom Plaza. Appellant Br. at 60.

Finally, ANSWER asserts that Freedom Plaza has unique physical characteristics that make it more hospitable for public demonstrations than other available areas such as John Marshall Park. *See* Appellant Br. at 41, 56. ANSWER rejects John Marshall Park as unable to accommodate "sizeable bleachers, stage or sound platforms." Decl. of Brian Becker ¶ 39, J.A. at 445. That argument cuts both ways. Freedom Plaza also offers a particularly desirable vantage point for spectators and media. It was thus reasonable for the Park Service to include space on a Plaza that can accommodate such activities within the package of areas covered by the priority permit.

**3. The Regulation Leaves Ample Alternative Channels for Expression.** To stand as a reasonable time, place, or manner restriction, the priority permit regulation must also leave open ample alternative channels for communication. *See Boardley v. U.S. Dept. of Interior*, 615 F.3d 508, 524 (D.C. Cir. 2010). ANSWER disagrees that demonstrators have adequate access, principally by framing the issue as whether alternative channels remain at Freedom Plaza itself. *See* Appellant Br. at 54; Appellant Reply Br. at 27-28. The relevant question here, however, as ANSWER itself comes close to acknowledging, is whether ANSWER retains channels for expression at the Inaugural Parade. *See* Appellant Br. at 25 ("[T]he object of proper analysis is the Pennsylvania Avenue sidewalks and parklands on Inauguration Day . . . ."). As ANSWER described its objections in 2005, for example, it wished to express its opposition to "the war policies of the Bush administration," Compl. at 3-4, and it then anticipated that it would demonstrate "at the next [2009] Presidential Inauguration," *Id*. ¶ 85. In 2013, ANSWER similarly sought to "engage in expressive, free speech activities in connection with the January 20, 2013 Presidential Inauguration and related

parade." Suppl. Pleading ¶ 1. ANSWER criticizes governmental policies, and its Inaugural demonstrations are "directed at parade participants" including "the Administration members and [the] President in the parade." Compl. ¶¶ 46, 60. ANSWER has not persuaded us that the relevant forum here is limited to Freedom Plaza, such that alternative channels alongside the celebration and parade that are directly visible to its target audiences are inadequate.

The 2008 regulation is dramatically narrower than the permit we invalidated in *Mahoney*. There, the Park Service "issued itself a permit not for a limited segment of the Pennsylvania Avenue sidewalks . . . but for the entire length of Pennsylvania Avenue sidewalks for a five-month period." 105 F.3d at 1458; *see also 2008 A.N.S.W.E.R.*, 537 F. Supp. 2d at 187 (invalidating Inaugural Committee permit for the parade route "from the National Capital Area, 3rd Street to 17th Street including sidewalks on both sides of the street"); *and see Women Strike for Peace,* 472 F.2d at 1293 (opinion of Wright, J.) (government "may not preempt the entire Ellipse when only a partial preemption would fully vindicate its interest"). As described above, the current regulation sets aside 13 per cent of the Inaugural Parade route along Pennsylvania Avenue for Inaugural Committee bleachers. 73 Fed. Reg. at 67,741. Another 17 per cent is prioritized for other logistical purposes, including media. *See* Tr. of Mot. Hr'g at 11. Seventy per cent of the portion of Pennsylvania Avenue abutting the parade route is available for members of the public, including groups with permits to demonstrate. 73 Fed. Reg. at 67,741. By excluding from the priority permit "certain park areas that have been allocated to the [Committee] in past Inaugural Parades," the 2008 regulation "substantially increases the park areas available to the public and demonstrators." 73 Fed. Reg. at 67,741. We decline to establish where on the continuum—between *Mahoney*'s total

exclusion of protestors for several months and the current regulation's allocation of 70 per cent of the Parade route's sidewalks to the public—the government's priority allocation of space becomes reasonable.  We simply hold that this regulation is content neutral, reasonable, and provides ample alternative channels for communication.

* * *

We accordingly affirm the district court's grant of summary judgment to the Park Service.

*So ordered.*